## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DATA SUPPORT ASSOCIATES, INC | : | CIVIL ACTION NO. |
| Plaintiff, | : | |
| VS. | : | |
| | : | 3:02 CV 1418 (DJS) |
| MGE UPS SYSTEMS, INC. | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |
| MGE UPS SYSTEMS, INC. | : | |
| Third Party Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | |
| ENERSYS, INC., | : | |
| Third Party Defendant. | : | |
| | : | MARCH 15, 2004 |

## REQUESTS FOR JURY INSTRUCTIONS BY DEFENDANT, COUNTER-CLAIM PLAINTIFF, AND THIRD-PARTY PLAINTIFF MGE UPS SYSTEMS, INC.

In accordance with this Court's Joint Trial Memorandum Order, Defendant/Counterclaim Plaintiff and Third-Party Plaintiff MGE UPS Systems, Inc. (MGE") requests that the Court submit the following instructions to the jury. MGE reserves its right to submit additional requests for jury instructions depending on the evidence admitted at trial and/or following evidentiary rulings by the Court. MGE also reserves its right to file motions for directed verdict.

## I. INSTRUCTIONS RELATING TO CLAIMS OF PLAINTIFF, DATA SUPPORT ASSOCIATES, INC., AGAINST MGE

### 1. Breach of Contract

In this case, the plaintiff, Data Support Associates, Inc. ("DSA"), claims that the defendant, MGE UPS Systems, Inc. ("MGE"), breached various agreements that exist between these two parties. DSA and MGE have agreed that the contracts at issue were formed between them, but they disagree over the terms and interpretation of these agreements. When the parties disagree about the interpretation of a contract and whether it was breached, it is for you, ladies and gentlemen, to resolve this factual dispute. In order to do so, you must focus on the language actually used in the contract, rather than on what was in the minds of the parties. The unexpressed intent of the parties is of no legal significance. A promise that is not expressly made will not be read into a contract.

A contract is to be construed as a whole and all relevant provisions should be considered together. In giving meaning to the terms of a contract, it must be construed to effectuate the intent of the contracting parties. The intention of the parties to a contract is to be determined from the language used, interpreted in the light of the situation and motives of the parties and the circumstances connected with the transaction. In interpreting contract items, the intent of the parties is to be ascertained by a fair and reasonable construction of the written words. The language used must be accorded a common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. Where the language of the contact is clear and unambiguous, the contract is to be given effect according to its terms.

In its first claim, DSA alleges that MGE breached a contract for the purchase of a package of equipment sold by MGE to DSA, which included, among other things, certain battery systems, certain battery monitors and certain spill containment systems. The elements required to establish a successful breach of contract claim are (1) the existence of a contract and the content of the terms thereof, (2) the plaintiff's performance of its obligations under the contract, (3) the defendant's failure to perform its obligations under the contract, and (4) damages as a result of the defendant's failure to perform.

As DSA and MGE have agreed on the fact that a contract exists between them, you need not concern yourselves with this element. Rather, you must focus your inquiry on the facts in dispute, which are the actual terms of the contract and whether MGE has performed its obligations as determined by the terms of this contract. If you find either that the contract did not contain the terms that DSA alleges were breached or that MGE did not breach the terms of the contract, you must return a verdict in favor of MGE.

Thus, if you find that DSA has proven by a preponderance of the evidence that MGE failed to deliver to DSA the equipment identified in the contract in accordance with the terms of that contract, or that MGE delivered equipment that did not conform to the contract, then you may find that MGE breached the contract. On the other hand, if you find that DSA has not proven by a preponderance of the evidence that MGE failed to deliver the equipment as required by the terms of the contract, then you may not find that MGE has breached the contract and you must find that DSA was required to pay for the equipment delivered by MGE.

As an additional element, you must also find that DSA incurred damages as a result of MGE's breach in order to find for DSA on its breach of contract claim. In order to establish a claim for breach of contract against MGE, DSA must prove all elements of a contract claim,

including damages arising from the breach. Thus, if you find that DSA has been fully
compensated for the batteries that MGE supplied to DSA, then you must find that DSA has not
incurred damages as a result of any breach by MGE, if a breach in fact exists, and you must find
that DSA has not proven its claim for breach of contract against MGE.

HLO Land Ownership Associates Ltd. Partnership v. City of Hartford, 248 Conn. 350, 356-57,
        727 A.2d 1260 (1999);

John M. Glover Agency v. RDB Bldg., 60 Conn. App. 640, 644-45, 760 A.2d 980 (2000);

Foley v. Huntington Co., 42 Conn. App. 712, 726, 682 A.2d 1026 (1996);

Ubysz v. DiPietro, 185 Conn. 47, 51, 440 A.2d 830 (1981);

Lynch v. Davis, 181 Conn. 434, 440-41, 435 A.2d 977 (1980);

Bridgeport Pipe Eng'g Co. v. DeMatteo Constr. Co., 159 Conn. 242, 249, 268 A.2d 391   (1970);

Hess v. Dumouchel Paper Co., 154 Conn. 343, 348-49, 225 A.2d 797 (1966);

Shah v. Cover-It, Inc., CV 99 0068182S, 2003 Conn. Super. LEXIS 1470, *5-6 (May 13, 2003);

Lunn v. Hussey, CV 01 0085525, 2003 Conn. Super. LEXIS 401, *6 (Feb. 11, 2003);

Paglia v. McCue Mortgage Co., No. 0114424, 1994 Conn. Super. LEXIS 2077, *5 (Aug. 11,
        1994).

**2.    Contract Modification**

In this case, you heard evidence that with respect to the batteries installed at the Globix site in New York City, there was discussion between the parties about how those batteries would be tested and what standards would be used to determine whether the batteries passed those tests. DSA and MGE dispute whether these discussions modified the terms of their agreement.

A contract may be modified or abrogated by a new contract arising by implication out of the conduct of the parties. A modifying agreement need not be in writing, even where the original agreement being modified is in writing, nor must there be consideration for the modification.

If you find that DSA and MGE intended to modify one or more terms of their agreement relating to how those batteries would be tested or the standard used to determining whether the batteries were conforming, then you must find that a modification to the original contract arose out of the conduct of the parties.    Whether the conduct of one or more parties shows an intention to modify or abandon the original agreement is a question of fact for you to decide.

Conn. Gen Stat. § 42a-2-208;

U.S. v. Casle Corp., 895 F.Supp. 420, 427-28 (D.Conn. 1995);

Roth Steel Products v. Sharon Steel Corp., 705 F.2d 134 (6th Cir. 1983);

Chinigo v. Ehrenberg, 112 Conn. 381 (1930);

Skinner v. Tober Foreign Motors, Inc., 345 Mass. 429, 137 N.E.2d 699 (1963);

White & Summers, Uniform Commercial Code (2d Ed.), § 1-6.

### 3.    **Installment Contract**

As you are now well aware, DSA and MGE entered into a contract for the sale of equipment that included, among other things, batteries, battery monitors, and spill containment systems. Under the terms of this contract, MGE was to provide equipment to DSA and DSA was to pay for that equipment. Contracts like the contract that exists between DSA and MGE exist in one of two possible types. In the first of these two types, the merchandise, or equipment in this case, is delivered by the seller and accepted by the buyer in one lot or shipment. I will refer to this first type of contract as a "unitary contract." In the second of these two types, the merchandise, or equipment as the case may be, is shipped by the seller and received and accepted by the buyer in separate lots. I will refer to this second type of contract as an "installment contract."

An installment contract is different from a unitary contract. An installment contract is a single contract that authorizes or requires delivery in separate lots that are to be accepted separately. An installment contract allows separate deliveries, while a unitary contract assumes that delivery is to be made in a single lot. You need not find that the contract specifically states that the goods are to be shipped in separate lots, or installments, in order to find that the contract is an installment contract, but only that it impliedly authorizes the seller to deliver the goods in separate lots or installments and impliedly authorizes the buyer to accept or reject the lots or installments individually.

There are several factors that you may consider in determining whether the contract between DSA and MGE was an installment contract or a unitary contract. The factors that you may consider include, but are not limited to, whether the contract required or authorized the equipment to be delivered in separate lots, whether the contract required or authorized delivery

-6-

of the equipment to different locations or on different dates, and whether the contract required or authorized the equipment to be installed, tested, inspected, and accepted separately. You need not find all of these factors to be present in order to find that the contract between DSA and MGE is an installment contract. If, after considering these factors, you determine that the contract between DSA and MGE required or authorized the delivery of the equipment in separate lots to be separately accepted, then you must find that the contract between DSA and MGE is an installment contract. On the other hand, if you find that the contract does not require or authorize the equipment in separate lots to be separately accepted, but requires that the equipment be delivered and accepted in a single lot, then you must find that the contract is not an installment contract, but a unitary contract.

Conn. Gen Stat. § 42a-2-612;

Midwest Mobile Diagnostic Imaging, LLC v. Dynamics Corporation of America, 165 F.3d 27
    (6th Cir. 1998);

Emanuel Law Outlines, Inc. v. Multi-State Legal Studies, Inc., 899 F.Supp. 1081 (S.D.N.Y.
    1995);

Hubbard v. UTZ Quality Foods, Inc., 903 F.Supp. 444 (W.D.N.Y. 1995);

Amer Indus. Technologies v. Aero Tec Lab., 1994 U.S. Dist. LEXIS 6233 (D.De. 1994);

Traynor v. Walters, 342 F.Supp. 455 (M.D. Pa. 1972);

White & Summers, Uniform Commercial Code (2d Ed.), § 8-3.

4.    **Acceptance and Rejection Under an Installment Contract**

If you determine that the agreement between DSA and MGE is an installment contract, then you must make a different inquiry as to whether DSA rightfully rejected each of the battery systems, the battery monitors and the spill containment systems.

The buyer in an installment contract may reject any installment which is nonconforming if the nonconformity of that installment substantially impairs the value of that installment and cannot be cured. If the nonconformity does not substantially impair the value of the installment, then the buyer may not reject the installment. Furthermore, if the seller adequately assures the buyer that the nonconformity will be cured, the buyer must accept the installment, even if the nonconformity substantially impairs the value of the installment.

If the nonconformity with respect to one or more installments substantially impairs the value of the whole contract, however, then there is a breach of the whole contract and the buyer may reject the whole, even if the seller gives the buyer adequate assurance that the nonconformity will be corrected. The buyer reinstates the contract, however, if the buyer accepts a nonconforming installment without notifying the seller of rejection within a reasonable period of time.

Thus, if you find that the contract between DSA and MGE constitutes an installment contract, you may find that DSA rightfully rejected any installment only if you find that there was a non-conformity in that installment and that the nonconformity substantially impaired the value of the installment. If you find that an installment conformed to the contract, on the other hand, or if any nonconformity in the installment did not substantially impair the value of the installment, then you may not find that DSA rightfully rejected the installment. Additionally, if you find that MGE gave adequate assurance to DSA that the nonconformity would be cured, then

-8-

you may not find that DSA effectively rejected the installment – you must find that DSA accepted the installment – even if there was a nonconformity in the installment and that nonconformity substantially impaired the value of the installment.

With regard to acceptance or rejection of the entire contract, you may find that DSA rightfully rejected all the goods contracted for based on a nonconformity in one installment if and only if you find that the nonconformity in that installment substantially impaired the value of all the goods that it contracted to purchase from MGE.

Franklin Quilting Company, Inc. v. Orfaly, 1 Conn. App. 249, 251 n.3 (1984)

D.P. Technology Corp. v. Sherwood Tool, Inc., 751 F.Supp. 1038, 1044 (D.Conn. 1990)

White & Summers, Uniform Commercial Code (2d Ed.), § 8-3)

5.    **Rejection**

DSA claims in this case that it rejected the batteries, the battery monitors, and the spill containment systems. You must determine whether DSA performed any act that constitutes a valid rejection of each of the battery systems, the battery monitors, or the spill containment systems. I will begin my instruction on rejection by making an initial distinction between rejection and revocation of acceptance: rejection occurs prior to acceptance, while revocation of acceptance occurs after. Thus, if you find that DSA accepted the three categories of goods at issue in this case, and I will instruct you in a moment as to what acceptance means under the law, you may not find that DSA later rejected those same goods. If you find that DSA accepted the goods, then you must focus your inquiry on whether DSA revoked its acceptance, which I will explain to you in a moment.

In order for you to determine whether DSA rightfully rejected the battery systems, the battery monitors, and the spill containment systems, you must first determine whether each of these categories of equipment failed to conform to the contract in an important way. In other words, you may not find that DSA rejected the battery systems, the battery monitors, or the spill containment systems unless you find that there is a substantial nonconformity in each of these types of equipment.

If you find that either the battery systems, the battery monitors, or the spill containment systems failed to conform to the contract in an important way at the time they were tendered for delivery, then you must determine whether MGE exercised a right to cure the nonconformity and, if MGE did exercise that right, whether MGE cured the nonconformity or, after being given a reasonable opportunity in which to cure the nonconformity, failed to cure. If you find that MGE failed to exercise this right, or if you find that it failed to cure the nonconformity after

-10-

being given a reasonable opportunity to cure, then DSA was entitled to reject the nonconforming equipment. Thus, if you find by a preponderance of the evidence that the battery systems, the battery monitors, or the spill containment systems depart in an important way from the contract, you may find that DSA is entitled to reject the nonconforming goods if you find that MGE did not exercise a right to cure the nonconformity or, after being given a reasonable opportunity to cure the nonconformity, failed to so cure.

If you determine that DSA was entitled to reject the battery systems, the battery monitors, or the spill containment systems, or all of these items of equipment, you must next determine whether DSA did in fact attempt to reject the nonconforming equipment and whether the attempted rejection was effective. You may find that DSA rejected the nonconforming equipment if you determine that DSA attempted to reject the nonconforming equipment within a reasonable time after delivery of the equipment in question and that DSA notified MGE of its rejection within a reasonable time after discovering the nonconformity. You should consider the circumstances relating to rejection separately for each of the battery systems, the battery monitors and the spill containment systems. If you find that DSA did not attempt to reject the nonconforming equipment within a reasonable amount of time after delivery of the equipment in question, or if you find that DSA did not notify MGE of its rejection within a reasonable time of discovering the nonconformity, then you may not find that DSA rejected the goods.

There is an additional factor that you must consider in determining whether DSA rightfully rejected the equipment issue. A buyer may not reject goods that have materially deteriorated after they have been tendered for delivery except by reason of their own defects. Thus, when the condition of the goods materially deteriorates because of mistreatment or neglect

-11-

after they have been tendered for delivery, rather than because the goods were actually defective

to begin with, a buyer may not reject those goods.


White & Summers, Uniform Commercial Code (2d Ed.), § 8-3;

Dunleavy v. Paris Ceramics USA, Inc., CV02-0395709S, 2002 Conn. Super. LEXIS 4062 at *15
    (2002);

Midwest Mobile Diagnostic Imaging, LLC v. Dynamics Corporation of America, 165 F.3d 27
    (6th Cir. 1998);

T.W. Oil, Inc. v. Consolidated Edison, Co., 443 N.E.2d 932 (NY 1982);

Miron v. Yonkers Raceway, Inc., 400 F.2d 112, 119-20 (2d Cir. 1968);

Moxie Industries, Inc. v. Hayden, 677 F. Supp. 187, 192 (S.D.N.Y. 1988) ("Acceptance resulted
    from the failure to reject the perishable inventory within a reasonable period after it was
    received.").

6.    **Waiver of Right of Inspection**

A buyer may waive his or her right of inspection.  In order for you to find that DSA waived its right to inspect the battery systems, the battery monitors, and the spill containment systems, there must be some indicia of DSA's consent to do so, either expressly or by agreeing to terms which are inconsistent with a right to inspect. Thus, if you find that DSA agreed to terms with MGE that are inconsistent with DSA's right to inspect these goods, or if DSA expressly waived its right, then you may find that DSA accepted the goods even if you find that DSA has not inspected the goods at issue.


See Conn. Gen. Stat. § 2-513

Liverpool v. Baltimore Diamond Exch., Inc., 369 Md. 304, 331 (2002)

### 7.    <u>Acceptance</u>

In this case, DSA has claimed that it rejected and did not accept certain goods that it contracted to buy from defendant MGE. The goods at issue in this dispute are certain battery systems, certain battery monitors and certain spill containment systems, all of which were components of a larger package of equipment sold by MGE to DSA. You now must determine whether DSA has "accepted," as I define that term to you, each of these components of equipment sold to DSA. In determining whether DSA accepted the goods, you must make a separate determination of acceptance with respect to each of the battery systems, the battery monitors and the spill containment systems.

Acceptance of goods occurs in any of the following circumstances: (1) when a buyer, after having a reasonable opportunity to inspect, indicates to the seller that the goods are conforming or will be accepted despite their non-conformity, (2) when a buyer fails to make an effective rejection of the goods, or (3) where the buyer acts in a way that is inconsistent with the seller's ownership of the goods at issue.

Thus, if you find that DSA, after having a reasonable opportunity to inspect the battery systems, the battery monitors, or the spill containment systems, indicated to MGE that the equipment was conforming or that DSA would accept the equipment despite its non-conformity, then you must find that DSA accepted the equipment.

A buyer of goods is also deemed to have accepted those goods, and is obligated to pay the contract price for them, if after delivery of the goods and after the buyer has had a reasonable opportunity to inspect them, the buyer fails to give notice to the seller that the buyer rejects the goods. Although the buyer under these circumstances does not expressly indicate acceptance of

the goods, his failure to reject or to notify the seller of a nonconformity in the goods is given the same effect and constitutes acceptance. The required notice of rejection that the buyer must give to the seller does not have to be in writing so long as it adequately notifies the seller of the specifics of the buyer's claim of nonconformity in relation to what was ordered.

What constitutes a reasonable opportunity for the buyer to inspect goods is a matter to be determined by you based upon consideration of all of the facts and circumstances surrounding the particular transactions involved as disclosed by a preponderance of the evidence in the case. Similarly, what constitutes a reasonable time within which notice of rejection should have been given is a matter to be determined by you based upon consideration of all the facts and circumstances surrounding the transaction involved.

You must find that DSA accepted the goods if you find that it did not reject them in a reasonable amount of time and if you find that DSA had a reasonable opportunity to inspect the goods. The question of whether DSA timely rejected goods depends primarily on the reasonable amount of time necessary to inspect the goods. If you find that DSA had a reasonable time in which to inspect the goods and that DSA failed to inspect the goods in this time, then you must find that DSA accepted the goods.

If you find that DSA failed to make an effective rejection of the equipment, then you must also find that DSA accepted the equipment. In determining whether DSA failed to make an effective rejection, you are to consider the instructions that I gave you earlier

Finally, you must find that DSA accepted the equipment at issue in this case if you find that DSA acted in a way that was inconsistent with the ownership of the equipment by MGE. Whether DSA acted in a way that was inconsistent with MGE's ownership of the equipment is a

fact to be determined by you after considering all of the circumstances as disclosed by a preponderance of the evidence in the case.

The use of the goods for a short period of time by the buyer is not by itself considered an act inconsistent with the seller's ownership and does not necessarily constitute acceptance. There are many factors, however, that tend to show that a buyer has acted in a way that is inconsistent with the seller's ownership of the goods sold. For example, a buyer who resells goods or has them delivered to a third party is generally considered to have acted inconsistently with the seller's ownership and is considered to have accepted those goods, even if the goods are later shown to be non-conforming. The installation, use and retention of items for an unreasonably prolonged period of time are also considered acts inconsistent with the seller's ownership of those goods.

If, after considering all of the circumstances of this case, you determine that DSA acted in a way that was inconsistent with MGE's ownership of the equipment at issue in this case, then you must find that DSA accepted that equipment. If, on the other hand, you find that DSA's actions were not inconsistent with MGE's ownership of the equipment, then you may not find that DSA's conduct in this regard constitutes acceptance.

Additionally, a buyer is considered to have accepted goods if, after the goods have been tendered for delivery, the goods materially deteriorated except by reason of their own defects. Thus, when the condition of the goods deteriorates because of mistreatment or neglect after tender of delivery, rather than because the goods were actually defective to begin with, a buyer is considered to have accepted those goods. Thus, if you find that the battery systems, the battery monitors, or the spill containment systems materially deteriorated after MGE tendered them for

delivery, and this material deterioration was not the result of some defect in the equipment, then you must find that DSA accepted the equipment at issue.

Conn. Gen. Stat. § 42a-2-106 (2004);

Conn. Gen. Stat. §42a-2-601 (2004);

Conn. Gen Stat. § 42a-2-602 (2004;

Conn. Gen. Stat. §42a-2-608 (2004);

Uniform Commercial Code § 2-606, cmt. 4; see Conn. Gen. Stat. § 42a-2-606;

Miron v. Yonkers Raceway, Inc., 400 F.2d 112, 119-20 (2d Cir. 1968);

Moxie Industries, Inc. v. Hayden, 677 F. Supp. 187, 192 (S.D.N.Y. 1988) ("Acceptance resulted from the failure to reject the perishable inventory within a reasonable period after it was received.");

Bead Chain Manufacturing Co. v. Saxton Products, Inc., 183 Conn. 266, 271 (1981);

Quiet Automatic Burner Corp. v. Wetstone, 143 Conn. 276, 279 (1956);

Dunleavy v. Paris Ceramics USA, Inc., CV02-0395709S, 2002 Conn. Super. LEXIS 4062 at *15 (2002) (buyer's resale of goods inconsistent with seller's ownership and points toward acceptance);

Truslow & Fulle, Inc. v. Diamond Bottling Corp., 112 Conn. 181, 187 (1930);

John C. Kohler Co. v. United States, 204 Ct. Cl. 777, 789-90, 14 U.C.C. Rep. Serv. (Callaghan) 1159 (1974);

Plateq Corp. of North Haven v. Machlett Laboratories, Inc., 189 Conn. 433 (1983);

O'Malley, Grenig & Lee, Federal Jury Practice & Instructions, §126.30 (5th ed. 2000).

**8.    Revocation of Acceptance**

If you find that DSA accepted the battery systems, the battery monitors and the spill containment systems, you must next determine whether DSA revoked its acceptance of each of these items, or types, of equipment. You must treat each of these items of equipment separately in determining whether DSA has revoked its acceptance. Thus, you must make an individualized determination as to whether DSA revoked its acceptance of the battery systems, whether DSA revoked its acceptance of the battery monitors, and whether DSA revoked its acceptance of the spill containment systems.

Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for the revocation and before any substantial change in the condition of the goods occurs. It is not effective until the buyer notifies the seller of it. In order to revoke acceptance, DSA must show that the goods are non-conforming and that such non-conformity substantially impairs the value of the goods to DSA. After establishing both these conditions, DSA must then show, if you find that it knew of the non-conformity on acceptance, that it acted on a reasonable assumption that the non-conformity would be cured by the seller but was not. If you find that DSA did not know of the non-conformity at the time of acceptance, DSA must show that acceptance was reasonably induced, either by the difficulty of discovering the non-conformity before acceptance, or by MGE's assurances.

Thus, you must make an initial determination as to whether DSA accepted the goods with or without discovery of the alleged defect in the goods. If you find that DSA accepted the goods after discovering the alleged defect, then, in order to find that DSA rightfully revoked its acceptance, you must find that DSA accepted the goods on the reasonable assumption that the

defect would be cured and that MGE did not cure the defect within a reasonable time. If you find either that DSA's assumption that MGE would cure the defect was unreasonable or if you find that MGE did in fact cure the defect, then you may not find that DSA revoked its acceptance.

Returning to our initial question, if you find that DSA accepted the goods without discovery of any defect and a defect in fact exists, then, in order to find that DSA revoked its acceptance, you must find either that DSA's acceptance was induced by some difficulty of discovering the defect or that DSA's acceptance was induced by assurances made by MGE. If you find that DSA accepted the goods without knowledge of the defect, but you do not find that DSA's acceptance was induced by one of these factors, then you may not find that DSA rightfully revoked its acceptance.

You must also determine whether DSA notified MGE of the defect in the goods and whether DSA attempted to revoke its acceptance within a reasonable time after discovery of the defect, or within a reasonable time after DSA should have discovered the defect. If you find that DSA did not notify MGE of a defect in the goods within a reasonable period of time after DSA discovered the defect, or should reasonably have discovered the defect, then you may not find that it revoked its acceptance.

As a second line of inquiry, you must determine whether there is in fact a defect or nonconformity in the goods and, if you find that there is a defect or nonconformity, whether the defect or nonconformity substantially impairs the value of the goods. Revocation of acceptance is possible only where there is a nonconformity in the goods that substantially impairs the value of goods to the buyer.

-19-

Thus, in order to find that DSA revoked its acceptance of the battery systems, the battery monitors or the spill containment systems, you must find that there was a nonconformity in each of these categories of equipment, and that this nonconformity substantially impaired the value of the nonconforming equipment. If you do not find that there was a nonconformity in the battery systems that substantially impaired their value, then you may not find that DSA revoked its acceptance of the battery systems. Likewise, if you do not find that there was a nonconformity in the battery monitors or the spill containment systems that substantially impaired their value, then you may not find that DSA revoked its acceptance of the battery monitors or the spill containment systems.

Finally, the buyer must revoke his or her acceptance before any substantial change occurs in the condition of the goods that is caused by something other than the goods' own defects. A buyer may not revoke acceptance if the goods have materially deteriorated except by reason of their own defects. Thus, when the condition of the goods deteriorates because of mistreatment or neglect after acceptance, rather than because the goods were actually defective to begin with, a buyer may not revoke acceptance of those goods.

Conn. Gen Stat. § 42a-2-608 (2004);

White & Summers, Uniform Commercial Code (2d Ed.), § 8-4;

Uniform Commercial Code § 2-608, Comment ("(t)he buyer may not revoke his acceptance if the goods have materially deteriorated except by reason of their own defects");

Miron v. Yonkers Raceway, Inc., 400 F.2d 112, 119-20 (2d Cir. 1968);

Moxie Industries, Inc. v. Hayden, 677 F. Supp. 187, 192 (S.D.N.Y. 1988) ("Acceptance resulted from the failure to reject the perishable inventory within a reasonable period after it was received.");

Meat Requirements Coordination, Inc. v. GGO, Inc., 673 F.2d 229, 232 (8th Cir 1982);

Amer Indus. Technologies v. Aero Tec Lab., 1994 U.S. Dist. LEXIS 6233 (D.De.1994);

Royal Typewriter Co., Div. of Litton Business Systems, Inc. v. Xerographic Supplies Corp., 719
    F.2d 1092 (11th. Cir. 1983).

**9.      The Goods Are Required to Conform to the Contract at the Time of Tender of Delivery**

In order for DSA to reject the battery systems, the battery monitors or the spill containment systems, or to revoke its acceptance, as the case may be, DSA must prove by a preponderance that each of these categories, or types, of goods failed to conform to the contract in a material way when they were delivered or tendered for delivery. It is not enough for DSA to prove that the goods failed to conform to the contract at some later point in time. The critical moment is at the time of delivery or at the time that the seller offered to deliver the goods. Thus, if you do not find that DSA has proven by a preponderance of the evidence that the battery systems, the battery monitors or the spill containment systems failed to conform to the contract when they were delivered or tendered for delivery to DSA, then you may not find that DSA rejected, or revoked its acceptance, of these goods.

Miron v. Yonkers Raceway, Inc., 400 F.2d 112, 119-20 (2d Cir. 1968);

Moxie Industries, Inc. v. Hayden, 677 F. Supp. 187, 192 (S.D.N.Y. 1988) ("Acceptance resulted from the failure to reject the perishable inventory within a reasonable period after it was received.");

See Uniform Commercial Code § 2-608, Comment ("(t)he buyer may not revoke his acceptance if the goods have materially deteriorated except by reason of their own defects").

-22-

10.    **Battle of the Forms**

As you know, MGE and DSA entered into an agreement for the purchase and sale of certain battery systems, certain battery monitors and certain spill containment systems. MGE and DSA submitted several documents to each other in the process of forming the contract that exists between them. MGE and DSA do not dispute the fact that a contract exists, but rather they dispute what documents and terms comprise the contract. As I have previously instructed you, when the parties disagree as to the terms of a contract and the meaning of those terms, it is for you, ladies and gentlemen, to resolve this factual dispute.

There are certain circumstances under which parties may form a contract without actually completely agreeing on the terms of the contract. This circumstance can arise where one party submits a document to another party that sets forth the terms of the agreement to be entered into by the parties. Instead of taking that document on its face as the complete contract, the other party will often submit its own document in return, which can complete the contract, even though it may contain terms that are different from, or in addition to, the terms contained in the first document. In these circumstances, instead of finding that no contract exists, the first document will be treated as an "offer" to enter into a contract, and the second document will be treated as the "acceptance" of that offer.

Thus, in order for you to determine what terms are included in the contract between DSA and MGE, you must determine which of the documents at issue form the contract.

If you find that there is more than one document that purports to be a part of the agreement, then you must make a determination as to which of these documents form the contract between DSA and MGE. In order to make this determination, you first determine which document constitutes the "offer" to enter into a contract. Unless otherwise unambiguously

-23-

indicated by the language or circumstances, any document that invites acceptance in any manner and by any medium reasonable under the circumstances is construed as an offer.

You must then determine which document constitutes the "acceptance" of that offer. You may find that a document constitutes acceptance of the terms of the offer if you determine that the document is a definite and seasonable expression of acceptance or a written confirmation and it is sent within a reasonable period of time. A document may operate as an acceptance of the terms of the offer even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

If you find that the document constituting acceptance includes terms additional to or different from the terms included in the offer, then you must find that these terms become part of the contract unless (1) the offer expressly limits acceptance to the terms of the offer, (2) the additional or different terms materially alter the contract, or (3) notification of objection to the additional or different terms has been given within a reasonable time after notice of them is received.

Conn. Gen. Stat. § 42a-2-206;

Conn. Gen. Stat. § 42a-2-207;

White & Summers, Uniform Commercial Code (2d Ed.), § 8-4;

11.    **Integration Clause**

The April 10, 2000 purchase order contains what is referred to as an integration clause. An integration clause is a contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract. If you find that DSA and MGE are commercial parties and that the April 10, 2000 purchase order represents one of the documents forming their contract, then you must find that the April 10, 2000 purchase order is a complete and final expression of the intentions of the parties and you may not consider any other documents or evidence in your interpretation of the April 10, 2000 purchase order other than the terms expressly contained therein.

Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., 252 Conn. 479, 502-505 (Conn. 2000); Benvenuti Oil Co. v. Foss Consultants, Inc., 64 Conn. App. 723, 728 (Conn. App. 2001).

12.    **Damages**

Damages: Generally

I now want to inform you about the law of damages. First, since the defendant must address the issue of damages in defending itself in the claims brought by DSA, or completely lose its opportunity to do so, you must remember that none of the evidence or discussion relating to damages presented on MGE's behalf should be taken or construed by you as an admission that it is liable or that DSA is entitled to a damages award. Also, the fact that I am instructing you as to the proper measure of damages should not be considered as intimating any view of mine as to which party is entitled to your verdict in this case. Instructions as to the measure of damages should only be considered in the event you find in favor of DSA in accordance with the other instructions that I have given you.

You must not speculate or guess as to damages and under no circumstances should you let your sympathy affect your consideration of the law and the evidence. Likewise, it is not part of your function as jurors to punish the defendant or to be generous. It is the plaintiff's burden to prove each element and item of damage he claims; it is not the defendant's burden to disprove them. Thus, unless you find that the plaintiff has proven each element of its claims by the burdens of proof I explained to you and also has proven each item of damage by a fair preponderance of the evidence, you must find for the defendant on that item of damage.

The plaintiff has the burden of proving damages to a reasonable certainty. Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.

Gigliotti v. United Illuminating Co., 151 Conn. 114, 127, 193 A.2d 718 (1963);

-26-

Rosa v. American Oil Co., 129 Conn. 585, 590, 30 A.2d 385 (1943);

Gaudio v. Griffin Health Servs. Corp., 249 Conn. 523, 554, 733 A.2d 197 (1999);

See O'Malley, Grenig & Lee, Federal Jury Practice & Instructions, §129.01 (5th ed. 2000).

<u>Damages: Incidental to Breach</u>

Additionally, in your determination of the damages to be awarded to DSA, if any, you must first determine that there is a causal connection between MGE's conduct and the actual loss claimed and proved. In other words, the MGE's conduct must have brought about the loss DSA. Therefore, if you find that anything other than the conduct of MGE caused DSA's loss or caused some portion of that loss, then you must conclude that DSA has failed to satisfy its burden of proof.

<u>Conaway v. Prestia</u>, 191 Conn. 484, 493-94, 464 A.2d 847 (1983);

<u>Gigliotti v. United Illuminating Co.,</u> 151 Conn. 114, 127, 193) A.2d 718 (1963);

<u>Rosa v. American Oil Co.,</u> 129 Conn. 585, 590, 30 A.2d 385 (1943);

<u>Bonner v. Winter</u>, 175 Conn. 41, 48, 392 A.2d 436 (1978);

<u>Bates v. Carroll</u>, 99 Conn. 677, 122 A. 562 (1923).

### Damages: Return Plaintiff to the Position it Would be in had Breach not Occurred

If you find that DSA has proved that MGE has materially breached a contract with DSA, you must determine the amount of damages to award to DSA as a result of this breach. As an initial matter, in determining an appropriate measure of damages, you may not place DSA in a better position than it would have been if the contract had been performed. DSA is entitled to nothing in excess of that sum which compensates it for the loss of its bargain under the contract.

Argentinis v. Gould, 219 Conn. 151, 157-58, 592 A.2d 378 (1991);

Gargano v. Heyman 203 Conn. 616,621, 525 A.2d 1343) (1987);

Neiditz v. Morton S. Fine & Assocs., Inc., 199 Conn. 683, 688-89, 508 A.2d 438 (1986);

22 Am. Jur. 2d Damages § 46 (2d ed. 1988).

<u>Damages: Double Recovery</u>

DSA is not permitted to recover more than the amount of the damages it has actually suffered. In your calculation of DSA's actual damages you must remember not to duplicate any amount of damage or compensation that DSA has otherwise received, as DSA cannot twice recover damages for the same loss.

2 Douglas B. Wright & William J. Ackerman, <u>Connecticut Jury Instructions (Civil),</u> 343), at 553) (4th ed. 1993).

DSA's Claim to a Refund

DSA has claimed entitlement to a full refund of the price of the batteries, the battery monitors, and the spill containment systems. If you find that DSA is entitled to such a refund, the amount of the refund is limited to so much of the price as DSA paid. Therefore, if you find that DSA paid only a portion of the total price, then you must find that DSA is entitled to recover as a refund no more than that portion that DSA actually paid.

Conn. Gen. Stat. § 42a-1-711;

Barco Auto Leasing Corp. v. Veota House, 202 Conn. 106, 114, 520 A.2d 162 (1987).

## Mitigation of Damages

It is the duty of any person who has suffered losses to use reasonable diligence and reasonable means under the circumstances, in order to minimize its losses, i.e., to avoid, reduce or minimize the loss or damages suffered as a result of the wrongdoing. A party is not entitled under the law to recover damages flowing from consequences that it reasonably could have avoided or if its own action or inaction caused such damages.

If you find that plaintiff failed in any way to mitigate its damages, you must reduce any award by the amount plaintiff reasonably could have expected to recover through mitigation. To the extent that you are unable to calculate such amounts with any certainty, or if you have to resort to speculating about what amount plaintiff would have avoided, I am instructing you that you may not enter any award of damages for plaintiff and, thus, must find for the defendants on all counts.

E.g., Cary Oil Co. v. MG Ref. & Mktg., Inc., 90 F. Supp. 2d 401 (S.D.N.Y. 2000).

## II.    **Affirmative Defenses of MGE**

**13.    DSA's Recovery is Barred to the Extent it was Caused by Factors Other Than MGE, Including the Actions of DSA**

If you find that some or all of the damages that DSA seeks to recover from MGE were caused by factors other than the actions of MGE, including any damage caused by the actions of DSA or third parties, then you must reduce the damages that you award to DSA, if any, by the amount of those damages that were caused by factors other than MGE.

Bushy v. Forster, 243 Conn. 596 (1997)

-33-

14.    **Waiver**

In this case, you heard evidence that, with respect to the battery systems installed at the Globix site in New York City, there were discussions between the parties about how those batteries would be tested and what standards would be used to determine whether the batteries passed those tests. DSA and MGE have disputed whether these discussions modified the terms of their agreement.

Where the conduct of one or more parties to an agreement evidences an intent by that party to modify the terms of the agreement, but the facts and circumstances do not establish that there was an enforceable modification of the agreement, the conduct of the parties may operate as a waiver of the term or terms that the party, or parties, sought to modify. An attempted modification is effective as a waiver if the party seeking to enforce the modification reasonably relied on assurances that the modified terms were acceptable. Under these circumstances, the conduct of the parties operates as a waiver.

Thus, if you find that MGE sought to modify the method by which the batteries were to be tested and/or the standards that would be used to determine whether the batteries passed those tests, either by its own conduct or through the conduct of its subcontractor, Enersys, you may find that DSA's conduct constitutes a waiver of the disputed term if you find that MGE relied on assurances by DSA that the different terms would be acceptable. Whether the conduct of one or more parties constitutes a waiver is a question of fact for you to decide.

Conn. Gen Stat. § 42a-2-209;

Wisconsin Knife Works v. National Metal Crafters, 781 F.2d 1280 (7th Cir. 1986);

White & Summers, Uniform Commercial Code (2d Ed.), § 1-6.

## 15.    **DSA Must Have Standing**

DSA may only succeed on its claims if it has standing to bring each of these claims before this Court. In order to establish that a party has standing, the party must establish that it has a legally protected right or interest and that the right or interest has been injured by the action that is the subject of the suit.

Thus, if you find that DSA does not have a personal interest in the actions that are the subject of its suit against MGE, or if you find that DSA has not been harmed by MGE's actions, you must find that DSA has not been aggrieved and, thus, does not have standing.

Steeneck v. University of Bridgeport, 235 Conn. 572, 579, 668 A.2d 688 (1995).

### III.    MGE Claims Against DSA

### 16.    Breach of Contract

The counterclaim plaintiff, MGE, claims that the counterclaim defendant, DSA, breached certain contracts between it and MGE.

A contract is a promise or set of promises for the breach of which the law gives a remedy or the performance of which the law in some way recognizes as a duty. To be binding, a contract must include a manifestation of mutual assent to the terms and conditions of the contract. This is referred to as the "meeting of the minds." There must be a meeting of the minds; there can be no contract if only one party intends to be bound.

Because intent, including intent to be bound, is seldom susceptible to direct proof because it relates to a person's state of mind, the law presumes that a person intends the natural and probable consequences of the person's acts. The meeting of the minds or the mutual manifestations of intent may be made wholly or partly by written or spoken words or by other acts or conduct, and an internal or unexpressed intention not to be bound is ineffective.

In determining whether or not there was a contract, you must decide whether or not there was a meeting of the minds between the parties and a present intention to be bound.

The general instructions I gave you previously with regard to the elements of a claim for breach of contract apply to MGE's contract claims against DSA as well.


O'Malley, Grenig & Lee, Federal Jury Practice & Instructions, §126.01 (5th ed. 2000).

17.    **Promissory Note**

MGE claims that DSA failed to make payment on a promissory note in accordance with its terms. A promissory note is a promise by one person to pay another person absolutely and unconditionally a certain sum of money, at a time specified therein. The note need only be signed by the person promising to pay, and delivered to the person to whom payment is owed to be a binding contract between the parties to it.

If you find that DSA signed the note and delivered the note to MGE, that MGE performed its obligations under the promissory note and that DSA failed to perform its obligations, then you must find DSA liable to MGE for the full amount of the note. If you find that DSA is obligated to MGE under the note, then you must find that DSA is liable to MGE for damages in the amount due by the terms of the promissory note, including interest.

Brummagim v. Tallant, 29 Cal. 503, 505 (1866);

Engeleiter v. Young Kyun Shin, 1992 U.S. App. LEXIS 4008;

Sallie Mae v. Hanes, 181 F.R.D. 629, 1998 U.S. Dist. LEXIS 13422 (S.D.Ca 1998) (citing Cal.
    Civ. Code § 3302).

-37-

### 18. __Fraud__

MGE claims that certain conduct by DSA constitutes fraud. In order to prevail in its counterclaim of fraud, MGE must prove four elements by clear and satisfactory evidence. First, there must be a false representation that was made as a statement of fact. Second, MGE must prove that the representation was untrue and known to be untrue by DSA. Third, MGE must prove that DSA made the representation to induce MGE to act on it. And last, MGE must establish that it did so act and was injured thereby.

Alaimo v. Royer, 188 Conn. 36, 39 (1982);

Ryan v. Ryan, 2002 Conn. Super. LEXIS 294, at *7 (Conn. Super. Ct. Jan. 28, 2002);

Cormier v. Ulster Sav. Bank, No. 970483639S, 2000 Conn. Super. LEXIS 3016, at *13 (Conn. Super. Ct. Nov. 8, 2000);

Behrmann v. Behrmann, 110 Conn. 443 (1930);

White v. Miller, 111 Conn. 53, 57 (1930);

O'Malley, Grenig & Lee, Federal Jury Practice & Instructions, §123.02 (5th ed. 2000).

19.     **Puntive Damages for Fraud**

If you find that DSA has committed a fraud on MGE, you must determine whether MGE is entitled to punitive damages. If you find that DSA acted with a reckless indifference to the rights of MGE or in a way that was an intentional and wanton violation of those rights, then MGE is entitled to punitive damages, in addition to general and special damages.

Wedig v. Brinster, 1 Conn. App. 123, 134 (1983);

Brower v. Perkins, 135 Conn. 675, 680-81, 68 A.2d 146 (1949);

De Santis v. Piccadilly Land Corp., 3 Conn. App. 310, 315 (1985);

Doroszka v. Lavine, 111 Conn. 575, 577-78, 150 A. 692 (1930);

Collens v. New Canaan Water Co., 155 Conn. 477, 489, 234 A.2d 825 (1967).

## IV.    MGE CLAIMS AGAINST ENERSYS

**20.    Elements of MGE's Claims/Entitlement to Damages for Indemnification**

MGE has brought three claims against Enersys, a claim for breach of contract, a claim for indemnification, and a claim for breach of warranty. Each of these claims has elements that must be proven to you in order for you to find in favor of MGE on each of these claims. MGE brings these claims against Enersys only for indemnity of any defense costs and other liability that it may incur in the event that DSA prevails in some or all of the claims asserted by DSA against MGE in Count One of DSA's Second Amended Complaint. Thus, you need reach these claims only if you find that DSA has proven its claims with respect to the battery systems, the battery monitors, and/or the spill containment systems against MGE. If you find in favor of MGE on Count One of DSA's Second Amended Complaint, then you should not consider MGE's claims against Enersys.

21.    **Offer and Acceptance**

There are certain circumstances under which parties may form a contract with more than one document. This circumstance can arise where one party submits a document to another party that sets forth the terms of the agreement to be entered into by the parties. Instead of taking that document on its face as the complete contract, the other party will often submit its own document in return, which can complete the contract, even though it may contain terms that are different from, or in addition to, the terms contained in the first document. In these circumstances, instead of finding that no contract exists, the first document will be treated as an "offer" to enter into a contract, and the second document will be treated as the "acceptance" of that offer.

Conn. Gen. Stat. § 42a-2-206;

Conn. Gen. Stat. § 42a-2-207.

## 22.    **Breach of Contract**

The elements required to establish a successful breach of contract claim are (1) the existence of a contract and the content of the terms thereof, (2) the plaintiff's performance of his or her obligations under the contract, (3) the defendant's failure to perform his or her obligations under the contract, (4) and damages as a result of defendant's failure to perform. If you find that MGE and Enersys had a contract, that MGE performed its obligations under that contract in accordance with the terms of that contract, that Enersys did not perform its obligations in accordance with the terms of the contract, and that because of Enersys's failure to perform its obligations, MGE has incurred damages, you must find that Enersys has breached its contract with MGE.

Bouchard v. Sundberg, 80 Conn. App. 180 (2003).

23.    **Breach of Warranty**

MGE has also brought a claim against Enersys for breach of warranty. A warranty is a promise or guarantee made by a seller to a buyer concerning the thing to be sold. The elements of a successful breach of warranty claim are (1) existence of the warranty; (2) breach of the warranty; and, (3) damages proximately caused by the breach.

*The Existence of a Warranty*

There are three types of warranties that may be involved in MGE's claim against MGE, an express warranty, an implied warranty of fitness for a particular purpose, and an implied warranty of merchantability. If MGE can show the existence of any of these three warranties, the first element of a claim for breach of warranty is satisfied.

An express warranty arises when one of the following occurs: (1) the seller makes an affirmation of fact or promise to the buyer about the goods, which becomes part of the basis of the bargain, or (2) the seller makes a description of the goods which is made part of the basis of the bargain, or (3) the seller shows the buyer a sample or model which is made part of the basis of the bargain. The "basis of the bargain" means that the description, promise or sample was a foundation for the agreement. In all these situations, the seller creates an express warranty that the goods will conform to the promise, description, or sample given by the seller.

If you find that Enersys made an affirmation of fact or promise to MGE about the batteries, or that Enersys made a description of the battery systems to MGE, or that Enersys showed MGE a sample or model of the battery systems, and that the promise, description or sample became a foundation for the agreement between MGE and Enersys to buy the battery systems, you must find that an express warranty existed.

An implied warranty of fitness for a particular purpose arises when (1) the seller knows of the buyer's particular purpose for buying that product, (2) the seller knows that the buyer is relying on the seller's skill to provide a product that will satisfy the particular purpose, and (3) that the buyer did in fact rely on that skill.

If you find that Enersys knew of MGE's purpose for buying the battery systems, and that MGE relied on Enersys' knowledge to provide a product that would satisfy the purpose for which MGE wanted the battery systems, and that Enersys knew that MGE was relying on its skill and expertise, then you must find the existence of an implied warranty of fitness for purpose.

An implied warranty of merchantability arises automatically when a merchant sells goods to a buyer. A merchant is someone who is in the business of selling the types of goods being sold under a particular contract.

If you find that Enersys is in the business of selling goods like the batteries sold to MGE, you must find that an implied warranty of merchantability existed.

*Breach of Warranty*

The second element of a successful claim for breach of warranty is the actual breach of the warranty. What constitutes a breach of a warranty depends on the type of warranty at issue.

An express warranty is breached when the goods sold do not conform to the promise, description, or sample made or given by the seller to the buyer. If you find that an express warranty existed between Enersys and MGE, and you also find that the battery systems did not conform to the promise, description, or sample made or given by Enersys to MGE, then you must find that Enersys breached its express warranty.

An implied warranty of fitness for purpose is breached when the goods are not satisfactory for the particular purpose the buyer intended to use the goods for. If you find that an implied warranty of fitness for purpose existed between Enersys and MGE, and that the battery systems were not fit for the purpose for which MGE intended to use them, you must find that Enersys breached its implied warranty of fitness for purpose.

An implied warranty of merchantability is breached when the goods sold to the buyer by the merchant are not "merchantable" at the time of the sale. Goods are "merchantable" when they meet the following criteria:

 i. when the goods pass without objection in the trade; and

 ii. the goods are fit for the ordinary purpose for which such goods are used; and

 iii. each unit involved is of like kind and quality with the other units; and

 iv. the goods are adequately contained, packaged, and labeled as the agreement require; and,

 v. if there are any promises or affirmations on the contained or label of the goods, that the goods conform to those promises or affirmations.

If you find that an implied warranty of merchantability existed between Enersys and MGE, and that the battery systems (1) would not pass without objection in the trade, or (2) were not fit for the ordinary purpose for which the battery systems are used, or (3) that each battery was not of even kind and quality with each other battery, or (4) that the batteries were not properly contained or labeled, or (5) that the goods did not conform to any promises or affirmations of fact on the label or container, you must find a breach of the implied warranty of merchantability.

*Damages*

-45-

The third element of a successful claim for breach of warranty is that the damages or harm that the plaintiff has suffered was a result of the defendant's breach. In this case, MGE contends that if it is found by you to be liable to DSA for the battery systems, the battery monitors or the spill containment systems, and to owe damages to DSA as a result, then such damages were caused by Enersys's breach of warranty. MGE also claims that, in the event that you find it to be liable to DSA, the attorneys' fees that it incurred in this case were also caused by Enersys's breach of warranty.

If you find that Enersys breached its express warranty to MGE, and that MGE suffered the losses claimed by MGE because of Enersys's breach of express warranty, you must find in favor of MGE on the breach of warranty claim.

If you find that Enersys breached its implied warranty of fitness for a particular purpose, and that MGE suffered losses because of Enersys's breach, you must find in favor of MGE on the breach of warranty claim.

If you find that Enersys breached its implied warranty of merchantability, and that MGE suffered losses because of Enersys's breach, you must find in favor of MGE on the breach of warranty claim.

Conn. Gen. Stat. § 42a-2-314 (2004);

Conn. Gen. Stat. § 42a-2-313 (2004);

Conn. Gen. Stat. § 42a-2-315 (2004);

Omega Eng'g, Inc. v. Eastman Kodak Co., 30 F. Supp. 2d 226, 246 (D. Conn. 1998).

24.    **Indemnification**

The elements required to establish an indemnification claim will take a bit more explanation. Indemnification is the obligation of one person to reimburse or compensate another person for losses and expenses that the other person has incurred. MGE has brought a claim for indemnification from Enersys and seeks to have Enersys compensate and/or reimburse it for any losses and damages it may suffer because of any liability that may be imposed on it as a result of the claims asserted by DSA.

The right to indemnification can arise in one of three ways. First, the right to indemnification can arise when two people expressly agree that one will indemnify the other under certain circumstances. When two parties have expressly agreed to indemnification, the terms of that agreement control the right to indemnification and obligation to indemnify between the parties.

Second, the right to indemnification can arise impliedly between two persons who have a contract with each other. Each party is entitled to indemnification from the other party when the other party breaches the contract and that breach forseeably causes damages to a third person, for which the non-breaching person is held liable. [1]

---

[1] Depending on the evidence at trial, either California law or Illinois law may apply to one or more of MGE's claims against Enersys. There does not appear to be any material conflict between Illinois law and California law on these causes of action. Under Illinois law, the jury should be instructed as follows: If you find that (1) MGE and DSA are contracting parties, and (2) that MGE is not independently at fault for DSA's damages, then you must find that MGE is entitled to implied indemnification for all damages naturally and foreseeably arising from Enersys's breach of contract.

Zielinski v. Knapp & Son, Inc., 660 N.E.2d 1289, 1293 (Ill. App. Ct. 1995).

Chicago College of Osteopathic Medicine v. George A. Fuller Co., 719 F.2d 1335 (7th Cir. 1983)

Third, the right to indemnification can arise as a matter of fairness. It is fair to make one person indemnify another when: (1) the damages for which the person seeks indemnification are imposed on the person because of an obligation to the injured party, which in this case would be DSA if you find in its favor in its claims against MGE, and (2) the person who seeks indemnification did not actively or affirmatively participate in the wrong.

If you find that Enersys expressly agreed to indemnify MGE, and that Enersys's express agreement was to indemnify MGE under the circumstances present in this case, you must find in favor of MGE on the indemnification claim.

If you find that MGE and Enersys had a contract with each other, that Enersys breached the contract, that Enersys's breach forseeably caused harm to DSA, and that MGE is liable for DSA's injury, you must find in favor of MGE on the indemnification claim.

If you find that that MGE is liable for DSA's damages, that MGE's liability to DSA is the result of an obligation MGE had to DSA, and that MGE did not actively or affirmatively participate in the wrong which caused the harm to DSA, you must find in favor of MGE on the indemnification claim.

If you find in favor of MGE on the indemnification claim, you must find that MGE is entitled to reimbursement from Enersys for all foreseeable damages and losses that MGE suffered, including but not limited to, reimbursement for money paid, or to be paid, to DSA in the underlying action as a result of any nonconformity in the battery systems for which you find MGE liable to DSA or as the result of your finding MGE to be liable to DSA for the cost of the battery monitors and the spill containment systems; and all attorney's fees that MGE incurred in defending against DSA's underlying action and prosecuting its third-party complaint against Enersys.

Cal. Code. Civ. Proc. § 1021.6 (2004);

Cal. Code. Civ. Proc. § 3333 (2004);

Cal. Code. Civ. Proc. § 3300 (2004);

E. L. White, Inc. v. Huntington Beach, 21 Cal. 3d 497, 506-507 (1978);

     Bay Development, Ltd. v. Superior Court, 50 Cal. 3d 1012 (1990);

Watson v. Department of Transportation, 68 Cal. App. 4th 885, 890-891 (1998);

Nelson v. Quimby Island Reclamation Dist. Facilities Corp., 491 F. Supp. 1364, 1383 (N.D. Cal. 1980);

But see, Bear Creek Planning Committee v. Title Ins. & Trust Co., 164 Cal. App. 3d 1227 (1985), *overruled on other grounds*; but see, Los Angeles Nut House v. Holiday Hardware Corp., 825 F.2d 1351, 1356 (9th Cir. 1987).

DEFENDANT,
MGE UPS SYSTEMS, INC.

By: _____
      Michael P. Shea (ct#19598)
      Jason S. Weathers (ct#24579)
      Day, Berry & Howard LLP
      CityPlace I
      Hartford, Connecticut 06103-3499
      (860) 275-0100
      Its Attorneys