## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DATA SUPPORT ASSOCIATES, INC : | CIVIL ACTION NO. |
| Plaintiff, : | |
| VS. : | |
| : | 3:02 CV 1418 (DJS) |
| MGE UPS SYSTEMS, INC. : | |
| Defendant. : | |
| : | |
| : | |
| : | |
| MGE UPS SYSTEMS, INC. : | |
| Third Party Plaintiff, : | |
| : | |
| VS. : | |
| : | |
| ENERSYS, INC., : | |
| Third Party Defendant. : | |
| : | MARCH 25, 2004 |

### MGE'S SUPPLEMENTAL MEMORANDUM
### AND RESPONSE TO PLAINTIFF'S AND THIRD-PARTY DEFENDANT'S
### MEMORANDA REGARDING ANTICIPATED EVIDENTIARY PROBLEMS

In accordance with paragraph 11 of this Court's Joint Trial Memorandum Order, Defendant/Third-Party Plaintiff MGE UPS Systems, Inc. ("MGE"), submits this Supplemental Memorandum and Response to the March 15, 2004 Memoranda Regarding Anticipated Evidentiary Problems submitted by Plaintiff Data Support Associates, Inc. ("DSA"), and Third Party Defendant Enersys, Inc. ("Enersys").

### SUPPLEMENTAL MEMORANDUM OF MGE
### REGARDING EVIDENTIARY PROBLEMS[1]

DSA's proposed voir dire questions, which MGE received after the Joint Trial Memorandum was filed on March 15, 2004, include the following proposed question: "Do you

---

[1] MGE reserves the right to raise additional evidentiary objections to exhibits or other evidence that DSA and Enersys seek to introduce in this action.

hold any biases or prejudices against out of state *or international* companies, as opposed to companies that are located here in Connecticut?" (Plaintiff's Proposed Voir Dire Questions, March 15, 2004, at 2.) It is unclear why DSA has submitted a proposed voir dire question referring to "international companies," as each of the parties to this case is incorporated and has its principal place of business in the United States. As the pleadings make clear, DSA is a Connecticut corporation, MGE is a California corporation, and Enersys is a Delaware corporation.

Having previously acted as MGE's sales representative, however, DSA is no doubt aware that the shares of MGE are wholly owned by a French corporation of the same name. This fact, of course, has no relevance to this lawsuit. Because DSA has mentioned "international companies" in its proposed voir dire questions, however, MGE is concerned that DSA may mention or seek to introduce evidence relating to the fact that MGE is owned by a French company. Such evidence could be prejudicial to MGE because of widespread anti-French sentiment due to diplomatic differences between the United States and France over the ongoing conflict in Iraq.

To eliminate any possibility that the jury might be unfairly prejudiced against MGE, MGE asks the Court to preclude DSA from mentioning in its opening statement or seeking to introduce any evidence regarding the nationality of MGE's parent company. Such evidence would be irrelevant under Fed. R. Evid. 402 and otherwise inadmissible under Fed. R. Evid. 403.

## **MGE'S RESPONSE TO EVIDENTIARY ISSUES RAISED BY DSA**

**I.    DSA's Receipt of Full Payment for the Batteries From Globix and Its Settlement with Globix are Relevant to Both Liability and Damages.**

One of DSA's biggest problems in this case is that it has already been fully compensated by its customer, Globix Corporation ("Globix"), for the damages it claims to have incurred from the alleged non-compliance of the batteries with the "Specifications" referred to in DSA's Second Amended Complaint. At trial, MGE will seek to use evidence of the settlement between DSA and Globix of their dispute over Globix's cancellation of certain equipment orders and related evidence of Globix's payments to DSA for the batteries to demonstrate the extent to which DSA has already been made whole and for other purposes. It is thus not surprising that DSA would seek to conceal that evidence from the jury. Beyond undermining DSA's damages claims, however, this evidence is central to several liability issues.

   A.    *The Settlement and Related Documents are Relevant to Acceptance*

The settlement between DSA and Globix consists of two agreements executed in January and November of 2001, respectively. In these agreements, Globix agreed to retain a portion of the batteries and DSA agreed to buy back from Globix the remaining portion of the batteries that it had previously sold (or, more accurately, resold) to Globix. The parties further agreed that Globix would make certain payments to DSA, and invoices produced by DSA in discovery show that, following the settlement, DSA received payment in full from Globix for the thirty-nine strings of batteries at issue in this case.

The settlement agreements and related documents demonstrate that DSA at one point resold all of the batteries to Globix, and that even after the settlement, Globix agreed to keep a portion of them. Resale is relevant to acceptance, which DSA concedes is a central issue in this case. (See Plaintiff's Mem. Regarding Evidentiary Problems at 4.) Where a buyer resells goods

to a third party and has been paid by the third party, the buyer is deemed to have accepted the goods. Dunleavey v. Paris Ceramics USA, Inc., 47 Conn. Supp. 565, 2002 Conn. Super. LEXIS 4062, at *12-*13 (2002). In addition, the settlement agreements contain language that is inconsistent with MGE's ownership of the batteries. A buyer is deemed to have accepted goods if the buyer acts in a way that is inconsistent with the seller's ownership of the goods. Conn. Gen. Stat. § 42a-2-606. Thus, the evidence relating to DSA's settlement with Globix and the associated payments is directly relevant to whether DSA has accepted the batteries under Connecticut law.

      B.      *Evidence Relating to Globix's Payments to DSA is Relevant to Damages*

DSA's principal, Rudy Kraus, testified that DSA received a total of approximately $5.4 million from Globix in payment for the thirty-nine strings of batteries at issue in this case. (February 11, 2004 Deposition of Rudy Kraus, attached as Ex. A, at pp. 39-40.) This is the same amount that DSA is seeking from MGE as damages for the batteries. (See id.) Thus, the amount that Globix paid DSA for the batteries has fully compensated DSA for the damages that it now seeks in this action, and DSA is not entitled to recover more than the amount of damages it actually suffered. Argentinis v. Gould, 219 Conn. 151, 157-58 (1991). If DSA has received full payment from Globix for the batteries, then any additional recovery from MGE would constitute an impermissible double recovery. Id. Thus, all evidence relating to payments that DSA received from Globix is relevant to the issue whether DSA has actually been damaged and the extent to which it can seek recovery of any damages from MGE.[2]

---

[2] Furthermore, DSA must have standing to bring its claims. In order to establish that it has standing, DSA must establish that it has been injured. Steeneck v. University of Bridgeport, 235 Conn. 572, 579 (1995). Evidence showing that DSA has been fully compensated for any harm is relevant to whether DSA has suffered any injury and thus whether it has standing to bring it claims.

      C.      *The Settlement Between DSA and Globix is Relevant to Causation.*

Evidence relating to the settlement and related circumstances is relevant to determining the cause of any damages suffered by DSA. DSA must prove that the damages it suffered, if any, were caused by MGE's breach. Conaway v. Prestia, 191 Conn. 484, 493-94 (1983). It is apparent from the face of DSA's settlement agreements with Globix, however, that DSA agreed to assume many of the costs it is now claiming as damages from MGE long before it ever sought to reject the batteries. Evidence of the settlement with Globix tends to show that any costs that DSA incurred stemmed from cancellation of portions of its contract with Globix and from the obligations that DSA agreed to assume as part of the settlement. Evidence relating to the settlement between DSA and Globix, including any payments, is therefore relevant to causation.

      D.      *Rule 408 Is Inapplicable.*

DSA argues that evidence of its settlement with Globix is inadmissible under Rule 408. The plain language of the Rule, however, disposes of this claim:

> "Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising … *a claim* which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of *the claim* or its amount. … The rule … does not require exclusion when the evidence is offered for another purpose. …

Fed. R. Evid. 408 (emphases added).

MGE does not intend to offer evidence of DSA's settlement of its claims against Globix for cancellation of equipment orders to prove anything with respect to DSA's claims against Globix. MGE has no interest in proving or disproving those claims, which relate to Globix's payment obligations under its equipment purchase contracts with DSA. Rather, MGE will seek to offer this evidence to defend itself against DSA's claim in this lawsuit that the batteries failed to conform to applicable specifications.

MGE may use evidence relating to the settlement between DSA and Globix for this purpose without violating Fed. R. Evid. 408. See Starter Corp. v. Converse, Inc., 170 F.3d 286, 293 (2d Cir. 1999) ("[E]vidence of a settlement agreement and its surrounding circumstances[,] though otherwise barred by Rule 408, can fall outside the Rule if it is offered for another purpose, i.e., for a purpose other than to prove or disprove the validity of the claims that [the agreement was] meant to settle." (internal quotation marks omitted)); Towerridge, Inc. v. TAO, Inc., 111 F.3d 758, 770 (10th Cir. 1997) (noting that "Rule 408 does not require the exclusion of evidence regarding the settlement of a claim different from the one litigated" and that "Rule 408 only bars admission of evidence relating to settlement discussions if that evidence is offered to prove 'liability for or invalidity of the claim or its amount'"). Additionally, "[i]f the settlement negotiations and terms explain and are part of another dispute, they must often be admitted if the trier is to understand the case." WEINSTEIN'S FEDERAL EVIDENCE § 408.08[5] at 408-36 (footnote omitted); see also Bituminous Construction, Inc. v. Rucker Enterprises, Inc., 816 F.2d 965, 968-69 (4th Cir. 1987) (upholding district court's admission of correspondence discussing settlement negotiations for purpose of showing party's understanding of its obligations under agreement and that plaintiff had made demand for payment).

While the policies animating Rule 408 would militate against admitting the January and November 2001 settlement agreements in any lawsuit between Globix and DSA regarding Globix's liability for cancellation charges, DSA cannot invoke those policies to conceal the facts that it has already been fully compensated and that it has accepted the batteries, which undermine its U.C.C. claims in this case. Accordingly, Rule 408 is inapposite, and the Court should allow evidence of the settlement between DSA and Globix.

## II. DSA's Treatment of the Batteries Is Relevant to Whether It Improperly Rejected or Revoked Acceptance and Whether It Failed to Mitigate Damages

In its Memorandum Regarding Evidentiary Problems, DSA urges the Court to exclude all evidence of DSA's treatment of the batteries that remained in storage in Sumter, South Carolina. Contrary to DSA's position, this evidence is relevant to several issues arising from Count One of DSA's Second Amended Complaint.

The batteries were manufactured and delivered to storage from July through October 2000 and accepted by DSA in writing in October, 2000. Thereafter, DSA issued certain purchase orders for the maintenance of the batteries, including hiring Enersys to perform "refresh charges" on the batteries remaining in storage.[3] During this period, DSA's purchase orders were incomplete and tardy.[4] Subsequently, in May 2002, DSA attempted to reject the batteries, allegedly because the results of a test performed on five of the thirty-nine strings of batteries in April, 2002, showed that the batteries did not perform to applicable specifications. But a buyer cannot reject or revoke acceptance of goods after it has allowed those goods to deteriorate. See Miron v. Yonkers Raceway, Inc., 400 F.2d 112, 119-20 (2d Cir. 1968). Therefore, DSA's failure to maintain the batteries in storage prior to its attempt to reject them in May 2002 is relevant to whether DSA was entitled to reject and/or revoke its acceptance of the batteries.[5]

DSA's mistreatment of the stored batteries also bears on whether DSA made a good faith attempt to mitigate its damages. DSA's neglect of the batteries prior to its attempted rejection

---

[3] Initially, DSA directed MGE to contract with Enersys for the refresh charges. For most of the period since the batteries have been stored in the Sumter, South Carolina warehouse, however, DSA contracted directly with Enersys for the refresh charges.

[4] Ultimately, DSA ceased altogether to arrange for the charging of the batteries in storage.

[5] It was not until over a year after DSA had begun neglecting the maintenance of the batteries that Enersys added acid to the batteries in storage.

potentially harmed the batteries and limited the resale options. Thus, DSA's mistreatment of the batteries is relevant to whether DSA properly mitigated any damages it incurred.

Furthermore, to the extent DSA seeks to offer evidence of any non-compliance of the stored batteries with the applicable specifications, DSA's failure to maintain the batteries is one of the factors the jury must consider in determining the cause of any such non-compliance.

Nonetheless, DSA argues that Enersys's addition of acid to the batteries in the summer of 2002 renders irrelevant any evidence of its own mishandling of the batteries. DSA's theory, for which it cites no authority, is that Enersys's addition of acid prevented DSA from testing the batteries for compliance with the applicable specifications and thus that Enersys *and* MGE should be sanctioned for Enersys's conduct by an order barring any evidence of DSA's treatment of the batteries. For starters, this proposition does not suggest that DSA's treatment of the batteries is irrelevant. Rather, it asserts that the Court should order sanctions for actions by Enersys that DSA regards as spoliation of evidence. But DSA offers no evidence that the addition of the acid actually amounted to spoliation. To the contrary, in the same breath that it condemns Enersys, DSA implies that Enersys added the acid to ensure that the batteries met applicable specifications. (See Plaintiff's Mem. Regarding Evidentiary Problems at 2 (arguing that addition of acid was an admission that the batteries failed to meet DSA's specifications).) In other words, DSA's argument that Enersys's addition of the acid constituted an "admission" implies that this action improved the batteries, rather than destroying or otherwise harming them.[6]

---

[6] DSA's argument also suggests that the addition of the acid was a subsequent remedial measure, making it inadmissible at trial under Fed. R. Evid. 407. MGE reserves its right to seek to exclude all evidence relating to addition of the acid under Rules 407, 402, and 403.

In any event, the Court should not penalize MGE, which played no part in adding acid to the stored batteries and did not even learn of it until several months into discovery, by prohibiting it from offering evidence of DSA's mishandling of the batteries to defend itself in this lawsuit. To the extent the Court finds that Enersys's conduct has prevented DSA from proving its claims, it should not hold that against MGE.[7]

**III.     DSA's Argument Regarding The Promissory Note is Meritless**

DSA argues that the Promissory Note (the "Note"), which is the subject of one of MGE's counterclaims against DSA, should be excluded. DSA also claims that a letter it allegedly sent to MGE with the fully executed Note somehow modified the Note by creating a "condition precedent," and that MGE may not offer the Note without the letter.

Obviously, the Note is relevant and admissible as to MGE's counterclaim that DSA failed to pay it in accordance with its terms. Moreover, the Note contains no reference to an "addendum," which is how DSA characterizes the letter mentioned in its Memorandum. The Note does, however, contain a provision prohibiting its modification except by a writing signed by both parties. The so-called "addendum," which is not signed by MGE, cannot modify the Note and is inadmissible as parole evidence and on relevance and other grounds.[8] Accordingly, contrary to DSA's assertions, the letter that it allegedly sent to MGE with the Note is not a document that "ought in fairness to be considered contemporaneously" with the Note under Rule 106.

---

[7] DSA has chosen not to bring any spoliation or other claim against Enersys.

[8] MGE intends to object to the cover letter at trial.

**IV.     The Sublease is Relevant and Admissible.**

One of MGE's counterclaims seeks damages based on DSA's breach of a sublease, by which MGE rented office space in New York City to DSA and which DSA abandoned and defaulted on prior to expiration of the term (the "Sublease").  Obviously, the Sublease is itself relevant and admissible as to MGE's counterclaim for breach of the Sublease, and DSA does not contend otherwise.  Rather, DSA seeks to challenge *the merits* of MGE's counterclaim by asking the Court to construe a termination provision in an unrelated agreement between the parties (the "Master Rep. Agreement").  According to DSA, that provision undermines MGE's claim for breach of the Sublease.

DSA cannot seek dismissal of MGE's counterclaim on the Sublease, however, in the guise of an evidentiary motion.  More importantly, DSA is wrong on the merits.  As MGE will show at trial, DSA and MGE executed the Sublease to address their rights with respect to the New York property *after* they executed the Master Rep. Agreement, which governs only their sales representation relationship.  Moreover, if the Court were to accept DSA's sweeping reading of the termination provision in the Master Rep. Agreement, it would have to dismiss DSA's claim against MGE relating to the batteries as well. In short, the general termination language of the Master Rep. Agreement on which DSA relies does not apply to the Sublease and does not otherwise support DSA's argument.

**V.      Evidence Regarding Other Battery Tests**

DSA seeks to exclude any evidence of performance of the batteries other than the results of tests aimed at determining whether the batteries complied with the "Specifications" referred to in DSA's Second Amended Complaint, i.e., the description of the batteries set forth in the April 7, 2000 "Bill of Material" (the "BOM").

As shown in MGE's Memorandum Regarding Evidentiary Problems, the evidentiary ruling that DSA seeks regarding other battery tests would also bar DSA from introducing any evidence regarding the analysis of the April 9, 2002 tests performed by Mr. Whitcomb and of any evidence regarding the May, 2003 test performed by Sierra Technologies ("Sierra"). As set forth in more detail in MGE's Memorandum, neither the analysis performed by Mr. Whitcomb nor the one performed by Sierra was based on the "Specifications." Therefore, to the extent the Court excludes evidence of the performance of the batteries under conditions other than those set forth in the "Specifications," it should also exclude Mr. Whitcomb's evidence and/or any evidence from Sierra. To the extent Mr. Whitcomb's and/or Sierra's testimony is allowed, however, the Court should in fairness allow evidence of other testing of the batteries to be offered by MGE and/or Enersys.

In any event, MGE should be allowed to introduce the results of other tests as evidence that (1) Enersys determined following laboratory testing that the cause of the lower-than-expected run times initially experienced by the batteries at Globix's New York site was "sulfation" produced by the extended storage of those batteries, (2) DSA agreed to resell the batteries for other applications as part of its settlement with Globix, and (3) DSA was not entitled to reject and/or revoke acceptance of the batteries because their strong performance on tests at other sites shows that their value was not substantially impaired. See Conn. Gen. Stat. § 42a-2-618; White & Summers, UNIFORM COMMERCIAL CODE, (4th ed.) Section 8-4.

### MGE'S RESPONSE TO EVIDENTIARY ISSUES RAISED BY ENERSYS

Enersys challenges five of the opinions disclosed by Marco Migliaro, MGE's expert, on Daubert grounds and relevance grounds. As shown below, each of these opinions is relevant and satisfies the requirements for the admission of expert testimony.

-11-

A witness qualified by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts, (2) the testimony is the product of reliable principles and methods, (3) the witness has applied the principles and methods reliably to the facts of the case, and (4) if the scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.  Fed. R. Evid. 702.  Expert testimony is liberally admissible, and the general approach is to relax the barriers to expert opinion testimony and to presume that such testimony is admissible.  See 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.02 (2002); see also Canino v. HRP, Inc., 105 F. Supp.2d  21, 27 (S.D.N.Y. 2000) (doubts about usefulness of expert testimony should be resolved in favor of admissibility).

Although the decision to admit expert testimony is left to the discretion of the trial judge, McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1042 (2d Cir. 1995), "[t]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."  See Fed. R. Evid. 702 (quoting United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi, 80 F.3d 1074, 1078 (5th Cir. 1996)).  Vigorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof remain the most appropriate means of attacking expert testimony. Travelers Property & Casualty Corp. v. General Electric Co., 150 F.Supp. 2d 360, 366 (D. Conn. 2001).

The degree of expertise that an expert witness has in his particular field is an essential consideration in determining the reliability of the expert's testimony and opinions.  See Travelers Property & Casualty Corp. v. General Electric Co., 150 F.Supp. 2d 360, 364 (D. Conn. 2001).  Indeed, an expert's strong qualifications may provide grounds for admitting his testimony as to a novel or otherwise untested methodology.  See State v. Porter, 241 Conn. 57,

86 (1997) ("The prestige and background of the expert witness supporting the evidence can play a role in determining whether a novel technique employed by that individual is likely to have any scientific merit.").

In this case, Enersys does not challenge Mr. Migliaro's qualifications. This is not surprising, because they are extensive, as set forth below:

- Mr. Migliaro has over thirty years of experience as a professional electrical engineer and in analyzing the characteristics, performance and maintenance of industrial batteries;

- He is the President of the Industry Standards Organization and has been recognized by the Institute of Electrical and Electronics Engineers (the "IEEE") for contributions to the application and standardization of battery technology for industrial and utility power systems;

- He has published more than forty technical papers and articles related to stationary battery selection, sizing, design, installation, maintenance, testing, charging, and the use of batteries with uninterruptible power systems, and has contributed to several books in the areas of stationary batteries, battery chargers, uninterruptible power systems and electrical machines;

- He has served as the editor of the IEEE Stationary Battery Sourcebook and a glossary of battery terminology;

- He has taught courses on battery selection to industry groups, multinational corporations and governmental agencies; and

- He has received numerous awards from the IEEE, and is listed in various biographical directories, including American Men and Women in Science, Who's Who in America, and Who's Who in the 21st Century.

In short, Mr. Migliaro has strong qualifications as an expert in the field of lead acid batteries.

**I.    Mr. Migliaro's Opinion That Enersys Should Have Advised MGE and DSA About Its Maintenance of the Batteries is Admissible.**

Enersys seeks to exclude Mr. Migliaro's opinion that Enersys should have advised MGE and DSA with regard to certain aspects of the maintenance of the batteries. In particular, Mr.

-13-

Migliaro's report discloses that he believes that Enersys should have advised DSA and/or MGE of the significant amount of time that it would need to charge the batteries that were stored in the Sumter warehouse, and that those batteries should have been stored and charged while oriented horizontally rather than vertically. Mr. Migliaro's opinions in this regard are directly relevant to several issues in this case and easily meet the standards for admitting expert testimony.

First, Mr. Migliaro's opinions are relevant to MGE's indemnity claims against Enersys. Enersys has made clear that it intends to defend against those claims by contending that MGE "controlled" the batteries for a period of time after MGE purchased them from Enersys and that MGE "controlled the selection of the batteries for the Globix – New York site." (See Joint Trial Mem. at 6.) In particular, MGE anticipates that Enersys will contend at trial that MGE did not issue a purchase order for charging the batteries in a timely manner and that, as a result, the batteries did not receive timely refresh charges.

To counter any such evidence, MGE must be allowed to show that, on the one occasion that it hired Enersys to perform refresh charges on the batteries, Enersys did not follow its own written recommendations regarding charging procedures and, worse, neglected to advise MGE that it had failed to do so. MGE should also be allowed to show that, had Enersys advised it of the lead time that Enersys would need to charge the batteries, it would have hired Enersys earlier to ensure that all of the batteries received refresh charges within the recommended time frame. All of this is relevant to the degree of "control" that MGE had over the batteries and to whether or not MGE "affirmatively participated" in any failure to maintain the batteries. (See MGE's Requests for Jury Instructions, March 15, 2004, at 48.)

Second, Mr. Migliaro's opinions that Enersys should have advised DSA about the maintenance issues with the batteries are also relevant to DSA's claims against MGE and MGE's

defenses to those claims, including causation and DSA's failure to mitigate damages. To preserve its right to reject or revoke acceptance of the batteries, DSA had to maintain them in accordance with the recommendations and information provided by the battery manufacturer, i.e., Enersys. DSA may argue at trial that it did, in fact, do just what Enersys advised to maintain the batteries, and, therefore, that the alleged nonconformity in the batteries resulted not from its own neglect but from MGE's failure to deliver conforming goods. If so, MGE must be allowed to present evidence that, to the extent DSA did rely on information provided by Enersys, such information was incomplete and omitted the fact that it would take six months to charge the batteries and that the batteries were sitting in a vertical position, contrary to the recommendations in Enersys's maintenance manual. In other words, Enersys's failure to provide DSA with the information DSA needed to arrange for the proper charging and maintenance of the batteries may itself have caused any deterioration of the batteries that has occurred. Thus, Mr. Migliaro's opinions that Enersys should have advised DSA as to these maintenance issues are relevant to causation.

Enersys points out that it has not been sued for failure to maintain the batteries correctly. MGE will contend at trial that, as part of its duty to mitigate its damages, DSA was required to seek its costs from Enersys, if necessary through litigation. Once DSA learned that Enersys failed to advise it about these maintenance issues, DSA should have taken action against Enersys for breach of contract and/or negligence to the extent that it has any evidence that the batteries in storage do not meet applicable specifications.[9] Thus, to the extent DSA incurred damages, Mr. Migliaro's opinions are also relevant to its failure to mitigate those damages.

---

[9] To be sure, it is unclear whether DSA has any such evidence. Nonetheless, to the extent DSA is able to make such a showing, MGE reserves the right to offer Mr. Migliaro's opinions on this issue.

Finally, Mr. Migliaro's opinions satisfy the Daubert standards because, as shown above, he is an acknowledged expert in the field, which Enersys does not dispute, and his methodology rests on industry literature and on Enersys's own maintenance manual for the batteries.

## II.     Mr. Migliaro's Opinion Regarding Electrolyte Drainage

Enersys also seeks to prevent Mr. Migliaro from opining on the likelihood that the vertical orientation of the batteries in storage diminished the effectiveness of the refresh charges. Enersys argues that Mr. Migliaro does not state his opinion with sufficient certainty, that he has not personally inspected the cells, and that he did not consider certain other tests on the batteries.

In attacking Mr. Migliaro's opinion, Enersys singles out his use of certain terms such as "may" and "likely" on one page in his 14-page report. At Mr. Migliaro's deposition, Enersys's attorney asked about Mr. Migliaro's use of the term "likely" as it applied to his opinion that storing the batteries vertically would cause drainage of the electrolyte. In response, Mr. Migliaro stated that based on the information he reviewed about the dimensions of the type of battery involved in this case, he assumed that there would "definitely be drainage." (Migliaro Depo., attached as Ex. B, at 172-73.) Given his experience in the area and the wealth of information he reviewed, Mr. Migliaro had a sufficient basis to make such an assumption, and his deposition testimony makes clear that he holds this opinion to the requisite degree of certainty. To the extent Enersys believes otherwise, it is free to cross-examine Mr. Migliaro on this point. See Travelers Property & Casualty Corp. v. General Electric Co., 150 F.Supp.2d at 366.

Enersys also objects to Mr. Migliaro's opinions on the grounds that he has not personally tested the batteries in storage. But Enersys's expert, Robert Nelson, has not tested the batteries in storage in this case either and that has not stopped him from opining about them.[10] Given its

---

[10] DSA has not tested the stored batteries either.

own expert's methodology, Enersys cannot seriously seek to preclude Mr. Migliaro's opinions on the ground that he has not tested the batteries in storage.

Enersys also objects to Mr. Migliaro's opinion as to electrolyte drainage on the ground that he rendered it without considering other tests performed on portions of the batteries taken from storage, in particular, those performed on the batteries installed at the J.P. Morgan Chase site at 4 Metrotech in New York. But this sort of objection goes to weight, not admissibility, and is not a basis for excluding Mr. Migliaro's opinions. See Perkins v. Origin MedSystems, Inc., 299 F. Supp.2d at 60.

### III. Mr. Migliaro's Opinions Regarding Addition of Acid

Enersys has objected to three opinions of Mr. Migliaro relating to Enersys's addition of acid to the batteries. Two of these opinions relate to the effect that the addition of the acid had on the batteries, and the third relates to whether Enersys should have informed DSA of its addition of acid to the batteries.

First, as shown above, Mr. Migliaro is a recognized expert in the field of lead acid batteries and is qualified to offer opinions about the effects of adding acid to such batteries. Second, contrary to Enersys's assertion that there is no basis for these opinions, Mr. Migliaro relied on his extensive experience and on industry literature. (See, e.g., Migliaro Depo. at 178-79.)

Enersys also seeks to exclude Mr. Migliaro's opinions regarding the effect of the addition of the acid on the ground that he has not personally tested the batteries. As shown above, if this were a serious methodological flaw, it would disqualify Enersys's expert as well. Enersys also asserts that Mr. Migliaro did not consider certain tests that Enersys conducted on two of the cells taken from storage. This is simply wrong. Mr. Migliaro did, in fact, consider documents

relating to these tests, which Enersys produced near the close of the discovery period, and listed them in a supplement to his report. Apparently, these tests did not lead Mr. Migliaro to change any of the opinions in his report, which is not surprising, because they related to only two cells among the thousands of battery cells involved in this dispute.

Finally, Enersys tries to justify its surreptitious addition of electrolyte to the batteries, and actually seeks to impugn Mr. Migliaro for failing to point to "industry literature" to support his opinion that it should have done something as basic as advise DSA before tampering with DSA's property. This objection is meritless. To the extent such an obvious point even requires an articulated "basis," Mr. Migliaro's opinion rests on his substantial experience with the customs and practices of the lead acid battery industry.

Mr. Migliaro, an eminently qualified expert in the battery field, has identified a sufficient basis for each of the opinions that Enersys seeks to exclude. These opinions are relevant to the issues in this case, satisfy <u>Daubert</u> standards, and are plainly admissible.

        DEFENDANT,
        MGE UPS SYSTEMS, INC.


By: _____
        Michael P. Shea (ct#19598)
        Jason S. Weathers (ct#24579)
        Day, Berry & Howard LLP
        CityPlace I
        Hartford, Connecticut 06103-3499
        (860) 275-0100
        Its Attorneys

## CERTIFICATION

      THIS IS TO CERTIFY that a copy of the foregoing was mailed on this date by regular first class mail to all counsel and pro se parties as follows:

| | |
|---|---|
| Gary S. Klein, Esq.<br>Sandak Hennessey & Greco, LLP<br>970 Summer Street<br>Stamford, CT  06905 | Bradford S. Babbitt, Esq.<br>Robinson & Cole<br>280 Trumbull St.<br>Hartford, CT 06103-3597 |
| Daniel Huyett, Esq.<br>Stevens & Lee<br>111 North Sixth Street<br>P.O. Box 679<br>Reading, PA 19603 | Patrick J. McHugh, Esq.<br>Finn, Dixon & Herling LLP<br>One Landmark Square<br>Suite 1400<br>Stamford, CT  06901-2689 |

 

_____
Jason S. Weathers