# EXHIBIT A

```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2                                              COPY
 3
    - - - - - - - - - - - - - - - - -)
 4                                   )
    DATA SUPPORT ASSOCIATES, INC.,   ) Civil Action No.
 5                                   ) 3:02 CV 1418 (DJS)
                      Plaintiff,     )
 6                                   )
        VS.                          )
 7                                   )
    MGE UPS SYSTEMS, INC.,           )
 8                                   )
                      Defendant.     )
 9                                   )
                                     )
10                                   )
    MGE UPS SYSTEMS, INC.,           )
11                                   )
            Third Party Plaintiff,   )
12                                   )
        VS.                          )
13                                   )
    ENERSYS, INC.,                   )
14                                   )
            Third Party Defendant.   )
15                                   )
    - - - - - - - - - - - - - - - - -)
16

17

18      DEPOSITION OF: RUDY KRAUS
        DATE: FEBRUARY 11, 2004
19      HELD AT: DAY, BERRY & HOWARD
                  CITYPLACE I
20                HARTFORD, CONNECTICUT

21

22

23  Reporter: Sandra V. Semevolos, RMR, CRR, LSR #00074
              BRANDON SMITH REPORTING SERVICE
24                 44 Capitol Avenue
                   Hartford, CT  06106
25                 Tel (860) 549-1850
```

Page 39

1      My question doesn't relate to the surplus
2  equipment for now.  My question relates to the
3  $26,000,000.  Are we clear?
4       A    Yes.
5       Q    All right.  Is it DSA's position that not a
6  dollar of that 26,000,000 that it received from
7  Globix should be credited against its damages claim
8  in this litigation?
9       A    I don't think it should.
10      Q    Okay.  So all of that 26,000,000 --
11 withdraw that.
12           None of that 26,000,000, according to DSA,
13 related to the batteries in this case; is that
14 correct?
15      A    None of the 26,000,000 related to the
16 batteries --
17      Q    Withdraw that.  None of the 26,000,000,
18 according to DSA, was payment for batteries;
19 correct?
20      A    A portion of the 26,000,000 was payment for
21 batteries, yes.
22      Q    What portion?
23      A    I don't know exactly.
24      Q    Do you have an estimate?
25      A    $141,000 times 39 strings, 5,482,939.80.

Data Support Associates vs MGE UPS Systems
2/11/2004                                                Rudy Kraus

Page 40

1   Q   By the way, where did you get the $141,000
2   figure?  Withdraw that.
3       Why did you use the $141,000 figure?
4   A   That was the cost figure per string with
5   all the services and shipment.
6   Q   When you say "the cost figure per string,"
7   is that the amount that DSA paid MGE per string?
8   A   That's correct.
9   Q   So your testimony is clear, you are saying
10  that of the $26,000,000 that Globix paid DSA,
11  approximately 5.4 million constituted payment by
12  Globix to DSA for sale of 39 strings of batteries?
13  A   That was credited towards the -- yes, it
14  was.
15  Q   Okay.  I guess, here is my question:  In
16  light of that, and I appreciate your candor on that,
17  why doesn't some or all of that 5.4 million reduce
18  the damages that DSA claims that it suffered in this
19  litigation?
20      In other words, DSA has been paid 5.4
21  million, according to you, for the sale of batteries,
22  but now DSA is suing MGE, and the amount for
23  batteries, incidentally, according to your
24  spreadsheet, is approximately 5.4 million; correct?
25  A   Yes.

# EXHIBIT B

Page 1

1            UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT
2
         CIVIL ACTION NO. 3:02 CV1418(DJS)
3

4    DATA SUPPORT ASSOCIATES, INC.,

5              Plaintiff,

6    -vs-

7    MGE UPS SYSTEMS, INC.,

8              Defendant.

9    _____

10            DEPOSITION OF MARCO MIGLIARO

11

12            Monday, February 2, 2004
                 11:05 - 4:28 p.m.
13

14         Esquire Deposition Services
       515 N. Flagler Drive, Suite P200
15          West Palm Beach, Florida 33401

16

17

18
    Reported By:
19  WENDY BEATH ANDERSON, RPR, CRR
    Notary Public, State of Florida
20  Esquire Deposition Services
    West Palm Beach Office   Job # 603555
21  Phone:  800.330.6952
            561.659.4155
22

23                    - - -

24

25                                          COPY

Page 172

1  that were not necessarily produced.

2      Q. Okay. Well, for a cell that has electrolytes
3  added at the factory, which is at the upper end of the
4  tolerance -- which in my mind would mean that there's
5  more electrolyte added within the tolerance range?

6      A. Correct.

7      Q. -- would that have an effect on your
8  determination of how much, if you will, drain there
9  would be of electrolyte as a result of the vertical
10 storage of the cells?

11     MR. SHEA: Object to the form of that. You
12     can answer it.

13     THE WITNESS: It would certainly be different
14     than a cell that was at the lower end, but I
15     couldn't tell you as much. Part of that, as an
16     explanation, I don't have all the design criteria
17     of the cell that would give me the ability to
18     determine what that is.

19 BY MR. HUYETT:

20     Q. Okay. Now, in that sentence you use the word
21 "is likely." Do you see the term "likely?"

22     A. Yes.

23     Q. Did you use that term because you couldn't
24 reach a definitive conclusion or opinion, if you will,
25 about whether or not storage of the cells in the

Page 173

```
 1  vertical position would allow some of the electrolyte
 2  in the separator mat to drain?
 3          MR. SHEA:  Object to the form.  You can
 4      answer.
 5          THE WITNESS:  No.  I would assume given the
 6      size of these cells that there would definitely be
 7      drainage, based on the height of the plate.
 8  BY MR. HUYETT:
 9      Q.  Okay.  Now, the next sentence you use
10  industry literature?
11      A.  That's correct.
12      Q.  Is your industry literature identified within
13  the -- within your report at all?
14      A.  It's identified as the documents reviewed.
15      Q.  Can we look at that for a moment?
16      A.  The report or the literature?
17      Q.  Well, I'm sorry.  I thought you meant that
18  the industry literature you referred to here was
19  identified somewhere in your report.
20      A.  It's identified under other documents.
21      Q.  Right.  Can we look at that?
22      A.  Sure.  It's on page 15.
23      Q.  Fifteen.  Okay.
24      A.  If we go down to the seventh bullet down,
25  that's the book by Dr. Berndt, B-E-R-N-D-T, entitled
```

1  time stored at the Hodge Warehouse and which were
2  subsequently installed at an installation called Metro
3  Tech?
4      A.   I've seen some data, I don't know whether
5  I've seen the Metro Tech data specifically, but I have
6  seen some data on some cells that were at the Hodge
7  Warehouse that were then later installed at other
8  facilities.
9      Q.   Okay. But as you sit here today, you can't
10 specifically recall the Metro Tech facility?
11     A.   Well, I remember --
12     MR. SHEA: Object to the form. Go ahead.
13     THE WITNESS: I remember the name Metro Tech.
14 As to whether I saw specific data to Metro Tech,
15 I'm not sure.
16 BY MR. HUYETT:
17     Q.   So if we started talking about the Metro Tech
18 data, I assume you wouldn't really be able to talk
19 about it because you can recognize the name but not
20 much more?
21     MR. SHEA: Object to the form. You can
22 answer.
23     THE WITNESS: That's correct.
24 BY MR. HUYETT:
25     Q.   Okay. Have you conducted -- and I really

1   want to focus again on maybe the last two sentences of
2   that paragraph where you give two opinions about cells
3   in which the glass separator is not adequately
4   saturated and then the subsequent opinion about the
5   incomplete elimination of plate sulfation.
6            Have you conducted any tests or experiments,
7   if you will, on DDS cells to verify those opinions?
8       A.   No, I have not.  The opinions are based on my
9   own experience and what I've read in the literature in
10  the industry.
11      Q.   Are you able to tell me what you've read in
12  the literature in the industry that would support your
13  two opinions in those two sentences?
14      A.   Those are the documents that I have listed.
15      Q.   The three ones that we talked about earlier,
16  the three bullet-pointed ones?
17      A.   That's correct.
18      Q.   Now, going back, if we can for a moment or
19  two, to the sentence we talked about earlier about how
20  it is likely that storage?
21      A.   Yes.
22      Q.   In reaching that conclusion that you
23  articulate in that sentence, do you have to take into
24  account the time when the -- the time or the period of
25  time the cells were stored in the vertical position?