UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DATA SUPPORT ASSOCIATES, INC.,<br>        Plaintiff | :<br>:<br>: CIVIL ACTION NO. 3:02 CV 1418 (DJS)<br>v.                                         :<br>: TRIAL BY JURY DEMANDED |
| MGE UPS SYSTEMS, INC.,<br>        Defendant and<br>        Third-Party Plaintiff | :<br>:<br>:<br>: |
| v. | :<br>: |
| ENERSYS INC.,<br>        Third-Party Defendant. | :<br>: |

**THIRD-PARTY DEFENDANT ENERSYS INC.'S
MEMORANDUM RESPONDING TO PLAINTIFF'S
MEMORANDUM REGARDING EVIDENTIARY PROBLEMS**

Third-Party Defendant EnerSys Inc. ("EnerSys") files this Memorandum pursuant to Paragraph 11 of this Court's Joint Trial Memorandum Order to respond to certain issues raised in Plaintiff's Memorandum Regarding Evidentiary Problems.

**I. THE COURT SHOULD DENY DSA'S ATTEMPT TO PRECLUDE EVIDENCE OF ITS MISTREATMENT OF THE BATTERIES.**

Plaintiff Data Support Associates, Inc. ("DSA") first asks the Court to deprive the jury of evidence of its own mistreatment of the industrial batteries after they were sold and delivered by EnerSys to MGE, who sold them to DSA. DSA's argument, unfortunately, is premised on an incomplete factual picture and on certain factual misstatements. The entire factual context showing why this evidence is relevant provides reason enough to deny this attempt by DSA to preclude the highly relevant evidence of its mistreatment of the batteries in question.

1

In 2000, EnerSys manufactured 39 industrial batteries (each battery was to consist of 240 battery cells), and sold these industrial batteries to Defendant and Third-Party Plaintiff MGE UPS Systems, Inc. ("MGE") for incorporation into MGE UPS systems sold to DSA. DSA had, in turn, contracted to sell these UPS systems to Globix Corporation, who planned to install them in a number of internet data center sites that Globix intended to construct throughout the country. When Globix experienced severe financial problems in 2000, the construction of the internet data center sites was first delayed and later canceled. The only Globix internet data center to utilize any of the 39 EnerSys industrial batteries was its site in New York, which installed just five of the 39 industrial batteries. DSAS stored the remaining 34 industrial batteries in a warehouse in Sumter, South Carolina <u>after</u> they had been sold and delivered by EnerSys to MGE and DSA.

As the EnerSys experts will testify, and as the EnerSys warranty and battery installation instructions require, when industrial batteries are not put into service within a certain period of time after they are manufactured and, instead, are put into storage, they must be stored under certain environmental conditions (such as temperature) and "boosted" at particular time intervals to maintain the performance level of the batteries. As one EnerSys expert has opined already, "Batteries have a finite shelf life and they start to undergo sulfation as soon as they come off formation [manufacture]." That means that unless appropriate measures are taken by the buyer (here, DSA) when industrial batteries are placed in storage (instead of placed into service), the batteries suffer a condition called sulfation, which affects the performance of the batteries when they are finally put into use.

Here, when Globix was unprepared to utilize any of the 39 industrial batteries according to the previously agreed-upon construction schedule (after EnerSys had delivered and sold the 39 batteries), DSA arranged to have all 39 batteries stored in a warehouse in South Carolina with no temperature control. The warehouse conditions were inappropriate for the storage of these kinds of batteries (as DSA knew), and the recommended boost charging of all the batteries was not arranged. As a result of this mistreatment of the batteries, sulfation of the batteries set in. Thus, by the time the five batteries were shipped from Sumter to Globix's New York site and installed in the MGE UPS systems, they were suffering from sulfation.

When the five batteries finally were placed in service and tested at the Globix New York site in the fall of 2001, they did not perform as expected. When EnerSys was notified of this in the fall of 2001, EnerSys employees went to New York immediately and took samples (in the form of 2 cells from a one battery) back to their laboratory for testing. This testing - witnessed by DSA - showed (and the test results are undisputed) that the battery cells suffered from sulfation. In the opinion of the experts at the time, the sulfation resulted from the storage and care of the batteries between the time the batteries were delivered by EnerSys to the buyer in 2000 and the time they were eventually placed into service at the Globix site in New York in the fall of 2001. It is this kind of evidence of the mistreatment of the batteries after they left EnerSys' hands that DSA wants to have precluded.

After the tests of the two battery cells from New York were conducted, DSA asked EnerSys to test sample cells from the 34 remaining industrial batteries in storage in Sumter, South Carolina. These test results showed, among other things, that while the stored battery cells suffered from sulfation, the battery cells could be restored to their performance

levels by conducting certain procedures on them. By this time, DSA knew that the storage conditions to which its had subjected these batteries were causing the batteries to sulfate, a condition which DSA knew could affect the batteries' performance. Again, it is this type of evidence that DSA wants to have precluded.

Today DSA continues to store 20 of the original 39 industrial batteries at issue[1] in the South Carolina warehouse. Their storage and maintenance is erratic and inconsistent, to say the least. There is no dispute that every day DSA subjects these batteries to incorrect storage conditions. Nonetheless, DSA wants to preclude evidence of these facts in an attempt to blame the performance of these 20 industrial batteries on something other than its own negligence.

DSA argues, however, that EnerSys "secretly prohibited" DSA from ever testing the 34 industrial batteries stored at various times in Sumter to determine their compliance with certain specifications. Nothing could be farther from the truth. During the summer of 2002, EnerSys and MGE offered to test the batteries in storage at their own expense to show DSA that the batteries were not defective when sold. Rather than accepting this opportunity to determine once and for all whether the batteries had been defective when sold, DSA rejected this offer. To this very day, nothing has ever prevented DSA from testing their batteries to determine whether they complied with the required specifications.[2]

But DSA argues that it was prevented from conducting these tests because EnerSys "tampered' with the batteries and "changed their physical and chemical makeup." Not

---

[1] Of the 39 original industrial batteries sold, five were installed in the Globix New York site and approximately 14 batteries were since sold by DSA, leaving approximately 20 batteries under DSA's care in Sumter, South Carolina.

[2] This is the first time - ever - that DSA has contended that it was "prevented" from conducting its own tests of the batteries. Had it raised this claim earlier, EnerSys could have - and would have - shown DSA how to test the batteries.

surprisingly, DSA can point to no fact to support this unsupportable claim. More factual context is required to understand why DSA's contention is unfounded. During the summer of 2002, when it became clear to EnerSys that DSA was going to continue to subject the 34 batteries in storage in Sumter to continued neglect, it decided to add 500 ml to each of the battery cells in storage. The reason EnerSys added 500 ml of electrolyte to each of the battery cells in DSA's storage was because EnerSys did not know what DSA was going to do to or with these battery cells in the future, and adding additional electrolyte would assist each cell in reversing the effects of the sulfation brought about by DSA's neglect.

While DSA unabashedly represents that this addition of 500 ml of electrolyte "changed the physical and chemical makeup" of the battery cells, the only expert to testify about the issue said unequivocally that the addition of the electrolyte did not change the chemical makeup of the cells. (Charles Snyder Deposition (11/12/03), at 107).[3] Thus, the whole premise for DSA's argument (that it was prevented from testing its batteries in storage to determine whether they met certain specifications because EnerSys' addition of this electrolyte changed the cells' physical and chemical makeup) is unsupported by any evidence whatsoever.

Certainly it is not supported by any "expert" of DSA, since no such expert has been identified or given any such opinion. In any event, nothing - including EnerSys' conduct - prevented DSA from conducting tests on any of the 39 industrial batteries, including the five batteries eventually installed at the Globix New York site and the 34 remaining batteries placed in storage by DSA in Sumter, South Carolina.

---

[3] To put this in context, when manufactured, each battery cell consists of 22,820 cc of electrolyte, which means that the addition of 500 ml adds only 2%.

5

To grant DSA's request to prevent either EnerSys or MGE from introducing relevant evidence that the performance of the batteries was the result of DSA's post-manufacture handling and care of the batteries would be highly prejudicial. It is evident from the record during discovery that the performance of the batteries is not the result of the manner in which they were manufactured by EnerSys, but is the result of DSA's treatment of the batteries they purchased from MGE.

Indeed, evidence of DSA's negligent care of the batteries after they were sold and delivered by EnerSys is highly relevant to DSA's claim that it rejected the sale of the batteries or revoked its acceptance of the batteries. Under Article 2 of the Connecticut Uniform Commercial Code, DSA's "rejection" and "revocation of acceptance" is invalid if the jury finds that DSA (the buyer of the batteries from MGE) permitted the "goods" (here, batteries) to materially deteriorate after the sale and delivery (here, because notwithstanding knowing better, DSA stored the batteries in an inappropriate warehouse and failed to arrange boosting at the appropriate intervals). (See cases and statutes cited by MGE in its Requested Jury Instructions, at Proposed Instructions 5 and 7.)

In summary, DSA's treatment (in this case, misstatement) of all 39 batteries after delivery to DSA is highly relevant to its claim that the batteries were defective when they left EnerSys' hands. EnerSys did nothing to prevent DSA from conducting its own tests; DSA just chose not to do so.

## II. THE COURT SHOULD REJECT DSA'S ATTEMPT TO PRECLUDE EVIDENCE OF $25 MILLION PAID BY GLOBIX TO DSA FOR THE 39 BATTERIES.

DSA wants to prevent the jury from hearing that Globix paid DSA $25 million for equipment, including the 39 industrial batteries at issue in this case. It argues that this payment

is unrelated to whether the batteries met the required specifications, and that the final arrangement between DSA and Globix was in the form of a "settlement," making such evidence inadmissible under Federal Rule of Evidence 408. Neither argument has any merit.

There are a number of reasons why the payment of $25 million by Globix to DSA is relevant and admissible.[4] First, as part of the agreements between DSA and Globix (by which DSA was paid $25 million), DSA repurchased from Globix a number of the industrial batteries. DSA then attempted to re-sell these batteries (the very same batteries it claims are defective in this case) to other purchasers, advertising them as meeting the very specifications they contend today that the batteries cannot meet. Thus, this repurchase of the batteries by DSA is inconsistent with its claim in this lawsuit that it rejected or revoked acceptance because the batteries were defective when delivered.

Second, the agreement to repurchase the batteries was not a "settlement"; it was a re-negotiation of the original agreement between DSA and Globix in light of Globix' deteriorating financial condition. Thus, Rule 408 does not apply.

Third, the amount of money Globix paid DSA ($25 million) is important because it shows that DSA was paid in full for the batteries initially, and then DSA later decided to repurchase the batteries from Globix. This suit never would have been brought by DSA if it had just enforced its original agreement with Globix and sold all 39 batteries to Globix. Yet it was DSA's voluntary action in re-negotiating its deal with Globix and repurchasing the batteries when it had no legal obligation to do so that led to its claim against MGE.

---

[4] On this argument, EnerSys adopts the arguments made by MGE in its memorandum submitted in opposition to DSA's attempt to exclude this evidence.

In summary, for these reasons, as well as those articulated by MGE in its opposition papers, the Court should deny DSA's request to preclude evidence regarding the agreements between DSA and Globix.

### III. THE COURT SHOULD REJECT DSA'S ATTEMPT TO PRECLUDE EVIDENCE REGARDING THE PERFORMANCE OF INDIVIDUAL CELLS AND EVIDENCE OF THE PERFORMANCE OF THE BATTERIES TO OTHER SPECIFICATIONS.

DSA wants to preclude[5] the abundant (and largely undisputed) body of evidence that shows that the industrial batteries alleged to be defective when delivered were, in fact, not defective at all. This evidence consists of extensive testing of many of the 39 industrial batteries, either as systems of cells or as individual cells. These tests show why certain batteries did not perform as expected (due to DSA's mistreatment) or performed in accordance with DSA's specifications. Notwithstanding this highly relevant evidence, DSA wants to preclude the evidence because some of the tests were of individual cells (instead of a string of 240 cells) and of strings of cells that included less than 240 cells.

DSA, however, again neglected to provide the important factual context needed to analyze its argument. The initial purchase order called for the sale of 39 industrial batteries consisting of 240 battery cells each. When EnerSys, or any battery manufacturer, manufactures this type of battery, it makes each cell individually and then ships the batteries by packing the individual cells on pallets -- in this case, 12 cells to a pallet. When the batteries are ready to be placed in service at a construction site, they are then "constructed" (usually by an electrical

---

[5] Precisely what evidence DSA wants to preclude and why is unclear from DSA's Memorandum, and so it is difficult - if not impossible - to address this argument as precisely as we would like to.

8

contractor unrelated to EnerSys) by placing into a rack the number of required cells (in this case, 240) and connecting the cells to make one battery.

Additionally, a battery of the type in question here can consist of different numbers of cells. For example, when DSA re-sold some of the 34 batteries it had remaining in storage, it sold batteries to JP Morgan Chase that consisted of 180 cells. In fact, when a buyer of batteries determines the type of battery its application requires, it looks at the manufacturer's specifications of an individual cell to determine how many cells the battery construction requires for its application.

Thus, a battery is the sum of its cells. DSA contends, nonetheless, that the testing of certain individual cells is irrelevant to determining whether the batteries (which could only consist of individual cells) met certain specifications or were sulfated. In this case, one of the tests of individual cells occurred when EnerSys tested two individual cells taken from one of the five batteries installed at the Globix site in New York. These tests showed, among other things, that DSA's mistreatment of the cells after they were delivered by EnerSys caused the cells to sulfate and not perform as expected. This is highly relevant to DSA's claims.

Not surprisingly, DSA has no expect who will testify that the testing of individual cells has no bearing on whether a battery (consisting of individual cells) meets certain requirements. Thus, the testing of individual cells is relevant and should not be excluded.

The second type of evidence (as far as we can discern from DSA's Memorandum) that DSA wants excluded is tests of batteries that DSA sold to JP Morgan Chase. These batteries consisted of less than 240 cells, in some cases 180 cells, but they are used in UPS systems, the identical application for which the EnerSys batteries were purchased originally.

Again, DSA can offer no expert testimony that these tests are not relevant to show that the EnerSys batteries in question here were not defective when sold. Conversely, EnerSys' expert will testify that these tests demonstrate that the EnerSys batteries were not defective when sold and delivered.

Of course, the test for relevancy under Federal Rule of Evidence 401 is quite broad. In this case, the testing evidence that EnerSys seeks to introduce is relevant under that rule. Any distinguishing factors that DSA thinks are significant can be brought out on cross-examination (since DSA has no witness to testify as to the irrelevance of these tests).

For all these reasons, EnerSys asks the Court to deny DSA's motion to exclude evidence of testing and performance of individual cells and other battery systems.

THIRD-PARTY DEFENDANT ENERSYS, INC.

By _____
Bradford S. Babbitt (ct# 13938)
Email: bbabbitt@rc.com
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
Tel.: (860) 275-8200
Fax: (860) 275-8299

and

Daniel B. Huyett (ct24418)
Stevens & Lee
111 North Sixth Street
P.O. Box 679
Reading, PA 19603
Tel.: (610) 478-2219
Fax: (610) 988-0801
Email: dbh@stevenslee.com

10

## **CERTIFICATION**

This is to certify that a copy of the foregoing Third-Party Defendant Enersys Inc.'s Memorandum Responding To Plaintiff's Memorandum Regarding Evidentiary Problems was transmitted by facsimile and mailed, first-class postage prepaid, on the 25th day of March, 2004, to:

Michael P. Shea, Esq.
Day, Berry & Howard LLP
CityPlace I, 185 Asylum Street
Hartford, CT 06103-3499

Gary S. Klein, Esq.
Sandak, Hennessey & Greco, LLP
970 Summer Street
Stamford, CT 06905

Bradford S. Babbitt