*MGE - File*

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DATA SUPPORT ASSOCIATES, INC.<br><br>Plaintiff,<br><br>v.<br><br>MGE UPS SYSTEMS, INC.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO.<br>) 3:02 CV 1418 (DJS)<br>)<br>)<br>)<br>)<br>)<br>) JANUARY 26, 2004 |

## SECOND AMENDED COMPLAINT

### The Parties

1.    Plaintiff Data Support Associates, Inc. ("DSA") is a corporation organized

and existing pursuant to the laws of the State of Connecticut with its

principal place of business in the State of Connecticut. Plaintiff is

therefore a citizen of the State of Connecticut for diversity jurisdiction

purposes.

2.    Defendant MGE UPS Systems, Inc. ("MGE") is, upon information and

belief, a corporation organized and existing pursuant to the laws of the

State of California with its principal place of business in the State of



California.  MGE is a citizen of the State of California for diversity

jurisdiction purposes.

### Jurisdiction and Venue

3.   This Court has subject matter jurisdiction over this matter pursuant to 28

U.S.C. Section 1332 in that there is complete diversity of citizenship

among the parties and the amount in controversy, exclusive of interest

and/or costs, exceeds $75,000.00..

4.   Venue is proper in this District pursuant to 28 U.S.C. Section 1391.

### First Cause of Action

(Breach of Purchase Order under the Connecticut Commercial Code, Article 2 of Title

42a)

5.   DSA is a 30 year old company specializing in electrical/mechanical

products and services related to the critical power and environmental

fields.

6.   DSA serves the needs of end users for their mission critical electrical,

HVAC, process, broadcasting, and data processing needs.

7.   DSA also provides technical support services related to the direct

application of the products it sells.

2

8.    DSA also provides installation supervision, service and maintenance agreements for all of the products it sells. DSA provides solutions to protect mission critical systems, provide reliable power, and ensure adequate environmental conditioning.

9.    DSA provides "turn key" services to end users such as medical facilities, data centers, financial institutions and others. That is, an end user contracts with DSA to have DSA build, install, and prepare a power management system suitable for that end user's need. In this regard, DSA acts as a designer and consultant.

10.   In this capacity, DSA also buys and resells the products of others, including MGE.

11.   MGE is a supplier of power quality solutions designed to increase the availability and uptime of any mission-critical application or process. MGE is a supplier of Uninterruptible Power Supplies (UPS), Static Transfer Switches (STS), Power Distribution Units (PDU), harmonic filters, surge suppressors, inverters, power conditioner, and power Management software. MGE also provides site audits, remote supervision of installed equipment, maintenance contracts, and training.

3



12. MGE is a reseller and/or distributor of the products of other companies. That is, MGE is not a manufacturer, but a "middleman" or supplier.

13. In or around early 2000, DSA was seeking to be awarded a contract to provide power management systems at several data centers operated by Globix Corporation ("Globix").

14. In that regard, DSA sought out a proposal from MGE to provide uninterruptible power system protection for the Globix sites (the "MGE System").

15. A key element of the MGE System is the battery system ("Battery System").

16. MGE is a reseller/distributor for, among other things, batteries manufactured by a company known as Yuasa and/or Enersys.

17. DSA provided MGE with the basic specifications for the Battery System, as dictated by the needs of DSA's customer, Globix.

18. A specialized engineering firm developed these general specifications for the Battery System to meet the needs of Globix, DSA's customer.

19. Based on DSA's request and the general specifications provided by DSA, MGE delivered a Bill-Of-Material dated April 7, 2000 to DSA ("BOM")

4



(A copy of the BOM is attached hereto as Exhibit A).

20.   The BOM operates as MGE's bid for the materials requested by DSA and

specifically identified all of the goods and services that MGE was to

provide to DSA for the Globix job.

21.   The BOM specifically identified the Battery System and specific

specifications (the "Specifications") to meet the needs of DSA:

**10 minute 20-year sealed cell Stackable battery system** to
support a 720kW inverter load consisting of the following:

Yuasa Battery System consisting of two hundred forty (240) DDS-125-31
stackable sealed lead acid batteries assembled in steel encased
polypropylene flame retardant jars.  Absorbed glass mat, calcium alloy
grid battery rated at 3.168KW per cell (753.9kWB) at ten (10) minutes rate
to 1.67vpc in 1.3 S.G. at 77 degrees F.  The cells are mounted in an epoxy
coated steel frame and shipped complete with lead plated copper inter-unit
connectors; grade 316 stainless steel connector nuts, bolts, and washers;
cell number set; NO-ox grease and an O & I manual.

22.   Pursuant to the BOM, as part of the MGE System, MGE was also to

provide certain support materials specially designed and built for the

Battery System such as battery monitors, spill containment kits and spill

cleanup and disposal kits (the "Collateral Materials").

23.   Globix awarded the contract to DSA in or around March, 2000.

24.   In or around April, 2000, after being awarded the Globix contract, DSA

5

proceeded to procure the materials it needed to fulfill the contract, including the MGE System.

25.    In this regard, in or around April, 2000, DSA and MGE entered into a certain Purchase Order ("PO") (A copy of the PO is attached hereto as Exhibit B).  The PO and the BOM incorporate the Specifications by reference.

26.    The PO is a valid binding contract supported by adequate consideration and DSA fully performed there under.

27.    The PO provides, among other things, that DSA shall have the right to demand and recover from MGE any and all fees and costs, including attorney's fees, in the enforcement of the terms and conditions thereof, or in recovering damages by reason of MGE's breach of any such terms and conditions.

28.    The PO provides for MGE to deliver the MGE System, including the Battery System and the Collateral Materials.

29.    Each battery in the Battery System cost $140,588.20.  The Battery System, though originally planned to contain fifty (50) batteries, ultimately contained thirty-nine (39) batteries for a total cost of $5,482,939.00, or

$140,588.20 each.

30.    The Collateral Materials consisted of 50 custom battery monitors at the price of $14,988.00 each ($749,400.00 total) and 30 custom spill containment systems at $4,568.50 each ($137,055.00). The total price for the Collateral Materials was thus $886,455.00.

31.    DSA paid MGE in full for the Battery System and the Collateral Materials. DSA has paid a total of $6,369,394.00 for the Battery System and the Collateral Materials.

32.    After being paid in full for the Battery System and Collateral Materials, MGE undertook to procure the Battery System and Collateral Materials from its supplier, Yuasa and/or Enersys.

33.    In turn, when Yuasa and/or Enersys completed manufacture of the Battery System and Collateral Materials, it delivered the Battery System and Collateral Materials to MGE.

34.    Thereafter, MGE stored the Battery System and Collateral Materials until such time as the Battery System could be inspected for conformity with the Specifications.

35.    Thereafter, DSA inspected and tested the Battery System in accordance

with the PO.

36.    Upon completing its inspection, DSA determined that the Battery System

did not comply with the Specifications and/or did not materially comply

with the Specifications.  That is, DSA determined that the Battery System

failed to conform to the BOM and the PO.

37.    Because MGE did not deliver a Battery System that conforms to the

contract and/or the Specifications in the PO and the BOM, DSA has

neither need nor use for the Collateral Materials and has rejected the same

and/or revoked its acceptance of the same.

38.    MGE breached its obligations under the BOM and the PO by failing to

deliver a Battery System that materially conforms to the Specifications

incorporated into the BOM and the PO.

39.    DSA timely and rightfully rejected the Battery System and/or justifiably

revoked its acceptance of the Battery System.

40.    Despite demand, MGE has failed, neglected and/or refused to

acknowledge DSA's rightful rejection and/or justifiable revocation of

acceptance and has failed, neglected, and/or refused to accept return of the

Battery System.

41.    As a result of the foregoing conduct, MGE is in breach of the BOM and

the PO, and DSA has suffered damages for which MGE is liable.

42.    As a result of the foregoing conduct of MGE, DSA is entitled to damages

for breach of contract under the BOM and the PO and is entitled to buyer's

remedies under Article 2 of Title 42a of the Connecticut General Statutes.

### Second Cause of Action

(Breach of Sales Representative Agreement and Master Sales Representative

Agreements)

43.    Plaintiff hereby repeats and realleges paragraphs 1-12 of this Complaint as

if fully set forth herein.

44.    On or about November 1, 1996, MGE, then known as EPE Technologies,

Inc., and DSA entered into a certain Sales Representative Agreement (the

"First Rep Agreement").

45.    MGE and DSA modified the First Rep Agreement from time to time.  A

copy of the First Rep Agreement, with various amendments, is attached

hereto as Exhibit C.

46.    MGE and DSA, on or about April 9, 2001, superseded the First Rep

Agreement by entering into a certain Master Sales Representative

9

Agreement ("Second Rep Agreement"). A copy of the Second Rep Agreement is attached hereto as Exhibit D. The First Rep Agreement and the Second Rep Agreements are referred to herein below as the "Rep Agreements".

47.   Pursuant to the Rep Agreements, MGE appointed DSA as a non-exclusive, independent sales representative for MGE products ("Products") within a certain territory.

48.   Pursuant to the Rep Agreements, DSA was to, and did, sell MGE Products to end users and MGE would issues invoices to and collect payments from those end users.

49.   Under the Rep Agreements, DSA was entitled to commissions for sales of MGE Products ("Commissions").

50.   From time to time from 1996 until September, 2002, DSA sold MGE Products to end users pursuant to the Rep Agreements.

51.   On each sale DSA made pursuant to the Rep Agreements, MGE owed DSA Commissions in accordance with the Commissions' rates set forth in the Rep Agreements.

52.   On or about September 7, 2002, MGE terminated the Rep Agreements.

10

53.    At the time of the termination of the Rep Agreements, MGE owed DSA

       Commissions under the Rep Agreement.

54.    Despite demand, MGE has failed, refused, and neglected to pay DSA the

       Commissions due and owing.

55.    As a result of the foregoing conduct of MGE, DSA has suffered damages.

WHEREFORE, the Plaintiff claims as to all applicable causes of action:

1.     Damages;

2.     All remedies afforded to buyers pursuant to Article 2 of Title 42a of the
       Connecticut General Statutes, including without limitation, consequential
       and incidental damages;

3.     Interest;

4.     Attorney's fees and costs pursuant to the PO;

5.     Costs; and  .

6.     Such other and further equitable relief as may be required.

                              **THE PLAINTIFF, DATA SUPPORT
                              ASSOCIATES, INC.**


                              By_____
                                   Gary S. Klein (ct 09827)
                                   Sandak Hennessey & Greco, LLP
                                   970 Summer Street
                                   Stamford, CT  06905
                                   (203) 425-4200
                                   (203) 325-8608 (fax)
                                   gklein@shglaw.com
                                   Its Attorneys

12

## CERTIFICATION

I certify that a copy of the foregoing was sent via first class mail, postage prepaid

on this January 26, 2004 to:

Michael P. Shea, Esq.
Day Berry & Howard
CityPlace I
Hartford, CT 06103

Bradford S. Babbitt, Esq.
Robinson & Cole, LLP
280 Trumbull Street
Hartford, CT 06103-3597

Daniel B. Huyett, Esq.
Stevens & Lee
111 North Sixth Street
P.O. Box 679
Reading, PA 19603-0679

_____
Gary S. Klein

13

# EXHIBIT B

# DSA

## DATA SUPPORT ASSOCIATES, INC.
*Critical Power & Environmental Specialists*

Phone: 212-459-8816
Fax: 212-459-8826

731 Main St.
Monroe, CT 06468



*April 10, 2000*

**MGE UPS Systems**
**1660 Scenic Rd**
**Costa Mesa, CA**

| | |
|---|---|
| *Purchase Order Number:* | #2807 |
| *To:* | MGE UPS Systems |
| *Order Date:* | April 10, 2000 |

## *Bill of Material*

The following purchase order is based upon the enclosed drawings and specifications produced by NK Engineers, E1-E5 dated 3/18/00 and specifications sections 16610 dated 31 Jan 00 and 16429 dated 29 March 00 and will be provided to DSA as operating systems as described in the above documents. Included also is Kameel's pricing spread sheet with quantity and costs.

*All modules and switchboards are to be painted with the following color combinations, frames, midnight black, 12-7001-UL, panels, robin red, 12-4001-UL, contact Morton Powder Coatings, 1-800-842-1994. Additionally, the top font grill of every switchboard panel is to have the Globix logo punched into it. The logo artwork will be provided.
*Provide paint sample for approval.*
*12 copies of submittals are required within 2 weeks*

1. **(40) MGE 800kVA, primary modules, Uninterruptable Power Supplies**
- 480/3/60, .9 power factor, twelve-pulse rectifier, with LCD monitor, inductive input filter, input isolation transformer and internal 100% rated static switch.

2. **(10) MGE 800kVA, isolated redundant modules, Uninterruptable Power Supplies**
- 480/3/60, .9 power factor, twelve-pulse rectifier, with LCD monitor, inductive input filter, input isolation transformer and internal 100% rated static switch.
- UPS units will include one additional year of parts and labor warranty, included at no extra cost.

3. **(10) MGE 4000amp 100% rated system static transfer switches**
- to be utilized with the ISO-redundant UPS unit (as seen in drawing)

4. **Monitoring for all MGE Isolated Redundant UPS Systems**
*All systems must include the following standard monitoring capabilities*
- MGE/EPE GTC Link Communication interface supporting the JBUS hexadecimal communications protocol.
- The FORESEER interface to the UPS is via the COM2 port on the RAUZ board, screw terminal XR11 located three terminals over from the right side.
- The interface for the COM2 port must be configured with Option 2=RS485.
- The RAUZ board must be C-0 revision or greater, revision B-3 will not work

5. **(50) 2000amp, stand alone DC disconnects**
- To be utilized for DC disconnect between battery system and UPS

6. **(10) MGE synchronization circuits**
- Utilized to synchronize five 800kVA units simultaneously.

7. **(10) MGE, UPS system mimic panels**
- This panel will remote UPS alarms and functions and will show a system consisting of four primary UPS units and one isolated redundant system from the next higher feed breaker through the PMMs.

8. **UPS Services**
- One factory test per 5 unit shipment, based upon manufacturer recommended/engineer required operational test procedures
- One factory witness per 5 unit shipment, to include four persons with provisions for air fare, food and lodging
- One 24 hour factory per module burn in per 5 unit shipment, off peak hours
- One manufacturer recommended/engineer required field test per 5 unit shipment
- One manufacturer recommended/engineer required site commissioning per 5 unit shipment
- One 2 day site training per 5 unit shipment and one additional training after 6 months.
- All procedure descriptions will be provided in the submittals
- Startup filming video, provided by vendor providing the equipment

9. **(50) Yuasa 10 minute 20 year sealed, valve regulated, battery systems with cabinets, covers and installation bus work**
- Each system will utilize 240 cells of Yuasa, 240DDS125-31
- Each system will include a (5) five year material and (15) fifteen year pro-rated warranty
- Yuasa will dispose of any returned battery during the 5 year period

10. **(50) Impedance based battery monitoring systems, with head end device to integrate with building monitoring**
- Each system will include the provision to monitor each jar in the battery string
- The system will have the capability to track and trend battery health and will provide the end user the ability to predict battery remaining lifetime.
- Each system will have the ability to report to a critical monitoring system through digital or analog methods, if so desired
- One factory startup of battery system

- (30) localy approved Enviroguard Spill Containment Systems

## 11. Battery Services
- One factory, IEEE 450 test per battery system
- One factory visit per 10 unit shipment, to include four persons with provisions for air fare, food and lodging
- One manufacturer recommended/engineer required field test per battery system
- One manufacturer recommended/engineer required site certification per battery system
- One manufacturer recommended/engineer required battery system test report per battery string
- One battery infra-red scan during battery run down
- Startup filming video, provided by vendor providing the equipment

## 12. (80) MGE, 200kVA, Plus, Power Management Modules, including
- Single copper transformer, 480 volt, Delta primary to 120/208 volt, Wye secondary
- **Provide one Square D Power Logic Meter at each PDU output**
    - The Power Logic Series 2000 and Series 600 Circuit Monitors will be equipped with the SY/MAX Point-to-Point Communications Protocol for Data Transfer Operations, as specified in the Square D instructions bulletin 30598-713-01.
- Internally integrated class I static switch, installed on the primary side of the transformer
- MGE switches will be provided with the Cyberex Mod-Bus, RTU interface option.
- Six 125amp three pole output breakers
- 24" floor stands and J boxes included

## 13. PMM Services
- One lot Factory test per (will be performed in lots of 8) 8 unit shipment; based upon manufacturer recommended/engineer required operational test procedures
- One manufacturer recommended/engineer required field test per 8 unit shipment
- One manufacturer recommended/engineer required site commissioning per 8 unit shipment
- One 2 day site training per 16 unit shipment and one additional training after 6 months.
- Startup filming video, provided by vendor providing the equipment

## 14. Freight Services
- Freight costs will be billed at the time of delivery and will be considered a pre-pay and add to the equipment cost. Freight will be billed at actual costs excluding mark-up or handling fees. (as per your estimated freight)
- Freight will be FOB dock to dock and will change ownership to the end user at the dock or point of acceptance.
- Any an all freight will be air ride dedicated truck
- All shipments will be properly insured for complete coverage for loss; the cost of which will be included in the freight invoice.
- All costs permits and handling fees for shipping of batteries or any other hazardous materials will be included in the above costs.

## 15. Non included
- Taxes, if applicable

## 16. Cost of the above package
- Total costs.............................................................$25,967,612.00

## Terms and Conditions

1. PRENEGOTIATED PAYMENT TERMS: Payment terms are 10% upon contract, 45% after the completion of factory test, 35%, 30 days after shipment and 10%, after startup and acceptance. All payments will be made 30 days after receipt of approved invoice.

2. SALES AND USE TAX: DSA will not be responsible for the collection or payment of any local, state or federal, use or sales taxes, or any excise, duty or levy imposed by any governmental authority or the manufacturer, sale, delivery and/or use of any units, components or accessories thereof. Seller will indemnify DSA for all amounts assessed against DSA in respect thereof.

3. DELIVERY: Delivery is scheduled for five sites of 10 units per site. The following cities will be delivered starting June/July 2000; Santa Clara, Los Angeles, Seattle, Boston and New York. These cities and sequences of delivery are subject to change, without additional charge to DSA. The quantity of delivery starting in June is 10 UPS units, July will be 20 units and August will be 20 units. All deliveries will be completed by Sept 01, 2000. The Seller will be held responsible for, and will indemnify DSA from any claims or damages incurred by reasons of, any delays or deviations in the above pre agreed schedule.

4. INTERPRETATION: This writing, together with the final drawings and specifications by NKE engineers, which is attached, is intended by the parties as a final and complete expression of their agreement.

5. APPLICABLE LAW: This agreement shall be construed in accordance with the internal laws of the State of Connecticut, and Connecticut conflict of laws shall not apply in any manner that results in the application of the internal laws of any jurisdiction other than Connecticut to enforce and/or construe this agreement.

6. ATTORNEYS FEES: In addition to any other rights in law or at equity, DSA shall have the right to demand and recover any and all fees and costs, including attorneys fees, in the enforcement of the terms and conditions hereof, and or in recovering damages by reason of the Seller's breach of any such terms or conditions.

7. ACCEPTANCE: The attachment of an invoice or any additional terms by the Seller to the executed purchase order shall be for the Seller's convenience only. No terms or

conditions set forth in such invoice or additional terms shall be binding upon DSA unless agreed to in writing by DSA.

8. WARRANTY: DSA shall receive Seller's standard warranty on equipment sold under this agreement. Said warranty will be transferable, at no charge.

9. MISCELLANEOUS: This agreement may be executed in any number of counterparts which together shall constitute one instrument. Amendments of this agreement may be made only in writing by DSA. This agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns. This agreement may be assigned by DSA, in its sole discretion, provided that all of the provisions hereof shall continue in force and effect.

10. MGE will pass on any early payment deduct, in whole, given to the end user by any vendor as discussed and agreed upon by Rudy Kraus and Roger Monaco.

Upon signature of this document, Data Support Associates would consider this contract valid.

_____           _____
MGE UPS Systems                    Data Support Associates

Sincerely,

*Data Support Associates, Inc.*

Rudy Kraus
*Principal*